UNITED STATES of America

v.

**Rocco Ernest INFELISE
and Robert Bellavia.**

**No. 90 CR 87.**

United States District Court,
N.D. Illinois, E.D.

July 15, 1993.

Mitchell A. Mars, Asst. U.S. Atty., Chicago, IL, for U.S.

Patrick A. Tuite, Chicago, IL, for Infelise.

Kevin E. Milner, Chicago, IL, for Bellavia.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

On March 10, 1992, the jury in this five defendant trial reached its verdict. The jury found defendant Rocco Ernest Infelise guilty on Counts 1–2, 6–7, 12–17, and 33–42 of the indictment.[1] With respect to Count 1, the jury found Infelise guilty of all charged unlawful debts and Racketeering Acts 5(a)–(c), 6–7, 10(a)–(b), 11(a)–(b), 17(a), 24, and 26.[2] The jury found Infelise not guilty of Racketeering Acts 8 and 9(a), and could not reach a verdict on Racketeering Act 17(b).[3] The jury also could not reach verdicts on Counts 8–9.[4]

The jury found defendant Robert Bellavia guilty on Counts 1, 2, and 6 of the indictment.[5] With respect to Count 1, the jury found Bellavia guilty of Unlawful Debt 4 and Racketeering Acts 5(a), 17(a), and 24.[6] The jury could not reach verdicts on Racketeering Act 17(b), and Counts 8–9.[7]

This case is currently before the court on defendants Infelise's and Bellavia's objec-

1. Count 1 charged Infelise with racketeering conspiracy in violation of 18 U.S.C. § 1962, Count 2 charged him with illegal gambling conspiracy in violation of 18 U.S.C. § 371, and Counts 6 and 7 charged him with running blackjack gambling and parlay card bookmaking operations in violation of 18 U.S.C. §§ 1955 and 2.

 Counts 12–17 charged Infelise with preparing and filing false and fraudulent income tax returns in violation of 26 U.S.C. § 7206. And, Counts 33–42 charged Infelise with failure to pay a special occupational tax and failure to register with the IRS as person engaged in the occupation of accepting wagers in violation of 26 U.S.C. § 7203.

2. Unlawful Debts 4 and 21–23 charged Infelise with unlawfully collecting money from Roy Salerno, Jack Duff, Jr., Thomas Picchietti, and Larry Weeks. Racketeering Acts 5(a)–(c) charged Infelise with running illegal sports gambling and parlay card bookmaking operations. Racketeering Act 6 charged Infelise with the extortion of Ken Pielet. Racketeering Act 7 charged Infelise with running a casino gambling operation. Counts 10(a)–(b) charged Infelise with the extortion of Patrick Gervais and Counts 11(a)–(b) charged him with the extortion of George Miller, Jr. Racketeering Act 17(a) charged Infelise with conspiring to murder Hal Smith. Racketeering Act 24 charged Infelise with running illegal floating blackjack games. And, Racketeering Act 26 charged Infelise with conspiring to bribe Wisconsin public officials.

3. Racketeering Act 8 charged Infelise with murdering Robert Plummer and Racketeering Act 9(a) charged him with the intimidation of Ken Eto. Racketeering Act 17(b) charged Infelise with murdering Hal Smith.

4. Counts 8–9 charged Infelise with conspiring to murder and murdering Hal Smith.

5. Count 1 charged Bellavia with racketeering conspiracy in violation of 18 U.S.C. § 1962, Count 2 charged him with illegal gambling conspiracy in violation of 18 U.S.C. § 371, and Count 6 charged him with running an illegal blackjack gambling operation in violation of 18 U.S.C. §§ 1955 and 2.

6. Unlawful Debt 4 charged Bellavia with the collection of unlawful debts from Roy Salerno. Racketeering Act 5(a) charged Bellavia with running an illegal sports gambling operation. Racketeering Act 17(a) charged him with conspiring to murder Hal Smith. And, Racketeering Act 24 charged Bellavia with running floating blackjack games.

7. Racketeering Act 17(b) charged Bellavia with murdering Hal Smith. Counts 8–9 charged Bellavia with conspiring to murder and murdering Hal Smith.

 With respect to the three remaining trial defendants, the jury found defendant Salvatore DeLaurentis guilty on Counts 1–2, 7–8, 19, 20–24, and 33–42, and not guilty on Count 3. Pursuant to this court's memorandum opinion and order dated December 30, 1992, the guilty verdict on Count 8 was vacated and declared a mistrial. With respect to Count 1, the jury found DeLaurentis guilty of all charged racketeering acts and unlawful debts except the jury found DeLaurentis not guilty on Racketeering Act 17(a).

 The jury found defendant Louis Marino guilty on Counts 1, 2, and 18 of the indictment. With respect to Count 1, the jury found Marino guilty of Unlawful Debts 2 and 5, and Racketeering Acts 5(a)–(b), 6–7, 9(a), 10(a)–(b), and 11(a)–(b).

tions to their presentence investigation reports ("PSIs") and the government's motion for upward departure.[8] For the reasons stated below, this court finds that Infelise's total adjusted offense level is 43, his criminal history category is IV, and his guideline sentence is life in prison. This court also finds that Bellavia's total adjusted offense level is 43, his criminal history category is I, and his guideline sentence is life in prison. Since none of the counts for which Infelise and Bellavia were convicted bear a maximum penalty of life imprisonment, this court will impose consecutive sentences on all counts.

Given the length of this opinion, the court has provided a Table of Contents.

## Table of Contents

I. Background
 A. Overview of the Ferriola Street Crew's Illegal Activities
 1. Illegal Gambling Operation
 2. The Collection of Unlawful Debts
 3. Payoffs and Bribes
 4. Hal Smith's Murder
 B. Defendants Infelise's and Bellavia's Roles in the Ferriola Street Crew
 1. Infelise's Role
 2. Bellavia's Role
II. The Objections to the PSIs and The Government's Motion for Upward Departure
 A. Joint Objections
 1. Defendants' and the Government's Proposed Calculations
 2. Defendants' Accountability for Hal Smith's Death
 3. The Masters Decision
 4. The Application of the Masters Decision to This Case
 a. Enhancements for More Than Minimal Planning, Use of a Dangerous Weapon, and Degree of Bodily Injury
 b. Enhancement for Pecuniary Motive for Smith's Murder
 c. Enhancement for the Physical Restraint of the Victim
 B. Objections Only Applicable to Infelise
 1. Enhancement for Serving as an Organizer or Leader
 2. Enhancement for Obstruction of Justice
 C. Objections Only Applicable to Bellavia
 1. Enhancement for Serving as a Supervisor or Manager
 2. Reduction for Being a Minor Participant and Enhancement for Obstruction of Justice
 D. Conclusions Regarding Infelise's and Bellavia's Objections
 E. The Government's Motion for an Upward Departure for the Conspiracy to Murder Hal Smith
 1. The Application of U.S.S.G. § 5K2.1
 2. The Extent of the Upward Departure
 3. Infelise's Argument Against the Imposition of Consecutive Sentences
 4. Infelise's Comparison of His Sentence to the Maximum Sentence for Career Offenders
 5. Infelise's Ex Post Facto Argument
 6. Summary of the Court's Ruling
 F. Other Upward Departure Issues and Enhancements
 1. Upward Departure for Participation in Organized Crime
 2. Objections Regarding Other Offense Level Calculations
 a. The Calculation of Infelise's Offense Levels for Racketeering Acts 6, 10(a), and 11(a)
 b. The Calculation of Infelise's Offense Level for Racketeering Act 26

The jury could not reach verdicts on Racketeering Acts 17(a)–(b) and Counts 8–9.

The jury found defendant Robert Salerno not guilty on Count 1 and the jury could not reach verdicts on Counts 8–9.

**8.** The government's motion is also intended to apply to DeLaurentis' and Marino's sentences. This court will defer considering the applicability of the government's motion for upward departure to DeLaurentis' and Marino's sentences until it rules on their objections to their PSIs.

 c. The Calculation of Infelise's Offense Levels for Counts 16–17 and 39–42
 d. Relevant Conduct
 (i) Infelise's Extortion of Ken Eto
 (ii) Infelise's Extortion of Gerald Kurth
 (iii) Bellavia's Collection of Juice Loan Payments for "Romi's Guy"
 e. The Calculation of Infelise's Offense Level for Unlawful Debt 23
 f. The Calculation of Bellavia's Criminal History Category
III. Conclusion

## Background

### A. Overview of the Ferriola Street Crew's Illegal Activities

This case involves the illegal activities of one operating unit of the Chicago Outfit or mob known as the Ferriola Street Crew.[9] This crew existed primarily to provide income to its members through: (1) the operation of various illegal gambling businesses such as sports bookmaking, parlay cards, and casino games, (2) the collection of "juice" or interest on usurious loans made by the crew, (3) the collection of "street tax" or money from individuals engaged in illegal or quasi-illegal businesses, and (4) the use of these proceeds in the criminal enterprise and other business ventures.[10] To conceal their actions, the crew also provided monetary payments to crew members who refused to testify against the crew, instructed potential grand jury witnesses to lie, and attempted to and bribed various police officers, judges, and other political officials.

From 1979 through the indictment in this case, the Ferriola Street Crew was involved in several illegal gambling businesses including a sports bookmaking business, two parlay card businesses from 1979 through 1983, floating blackjack games, and a casino. DeLaurentis also operated gambling rooms in 1982 and a floating dice game from 1986 through 1989 on behalf of the crew.

From 1976 through 1979, defendant William Jahoda operated a sports bookmaking business with Sam Sammarco. In early 1979, Jahoda told Sammarco that he wanted to switch to another bookmaking group and later told Sammarco that he would be working with Infelise. Shortly thereafter, Jahoda had several meetings with Infelise regarding setting up a bookmaking business. In the spring of 1979, Jahoda and representatives of the Ferriola Street crew agreed to form a bookmaking partnership by which profits would be split evenly between Jahoda, Infelise, and the crew. Jahoda was given responsibility for the day-to-day operation of the gambling operation including supervision of the wirerooms. Jahoda reported to Infelise on almost a daily basis regarding daily operations. This partnership continued until 1988 and generated profits of approximately $8 million.

In 1988, Jahoda was arrested twice for operating illegal blackjack games for the crew. As a result, Infelise replaced Jahoda with DeLaurentis, who became a partner and assumed responsibility for the day-to-day management of their gambling operation.[11] Defendant William DiDomenico acted as DeLaurentis' principal assistant. Jahoda re-

---

9. Given the number and specificity of some of defendants' objections, this court has carefully reviewed the trial transcripts and exhibits relating to this case. The final transcript of the trial was completed and filed with the district court on June 10, 1993. For a thorough discussion of the sentencing process in this case, see, *United States v. Infelise*, 813 F.Supp. 599 (N.D.Ill.1993).

10. Not all defendants convicted in this case participated in each of the crew's illegal activities. Several were involved solely or primarily in the

crew's gambling operation. However, each defendant benefited directly and financially from the crew's use of and reputation for violence. For example, competition against the crew's gambling operation was controlled by violence, threats of violence, and intimidation.

11. Prior to this appointment, DeLaurentis acted, at various times, as an agent, a collector, a 50/50 bookmaker, and a wireroom and collections supervisor for the crew.

mained involved in the business as a 50/50 bookmaker.[12]

Many other defendants were involved in the sports bookmaking business. For example, Bellavia was a collector and a supervisor for the operation. He also supervised the bookmaking activities of Freddie Braun. Marino started as an agent[13] and later became a collections supervisor. Marino also supervised the bookmaking activities of Homer Gonzalez for the crew. Michael Zitello acted, at various times, as an agent, 50/50 bookmaker, wireroom clerk, manager, and collector. Robert Covone, Ronald DeRosa, and Frank Maltese were agents, James Coniglio was a 50/50 bookmaker and a collector, James Nicholas was a 50/50 bookmaker, and Thomas McCandless and Robert Garrison were 50/50 bookmakers and wireroom clerks. Paul Spano permitted his business, Flash Interstate Delivery System, Inc. ("Flash Trucking") to be used as a meeting place and operations center for the business. He also kept money at Flash for use in the crew's bookmaking business.

From 1979 through 1983, the crew operated a parlay card business. This operation was initially operated by Infelise, Marino, DeLaurentis, Jahoda, and George Miller. During this time, parlay cards were distributed through agents. In the early 1980's, DeLaurentis attempted to take over all the parlay card businesses in Lake County, Illinois. During the business' later period, it was operated by Infelise, Jahoda, DeLaurentis, Michael Sarno, James Damopoulos, and others. Sarno provided the parlay cards for distribution.

From 1986 through 1988, the crew also operated a floating blackjack game managed by Jahoda under Infelise's supervision. Bellavia, Garrison, Nicholas, and Damopoulos acted as agents for this game. The blackjack games' net profits were split equally between Infelise, Jahoda, Ferriola, and Chuck Burge. The games were rigged through the use of professional card cheats and mirrored shoes. In total, approximately 24 floating blackjack games were held and nearly $1 million in profits was generated.

And, in the spring and summer of 1982, the crew operated a casino in a house in Libertyville, Illinois known as the Rouse House. The casino was managed by Jahoda under Infelise's supervision. The casino had rigged blackjack and craps games. Marino, DeLaurentis, McCandless, and Zitello worked at the casino, and DeLaurentis, McCandless, Zitello, and others provided players for the games. Casino profits were split equally between Infelise, Jahoda, Ferriola, and the crew. During its operation, the casino generated approximately $500,000 in profits.

The Ferriola Street Crew also collected unlawful debts, including gambling debts from losing bettors and interest and principal payments on juice loans. Interest on juice loans varied from 10% per month to 10% per week. Losing bettors who were unable to pay their gambling debts often were given juice loans for the balance of their gambling debts.[14] The crew also provided bankrolls to crew members and others from which to make juice loans and from which the crew received a percentage of the money obtained.[15]

12. 50/50 bookmakers provided the crew with players and agents, and shared equally in the profits and losses generated by their players and agents.

13. Agents controlled and directed bettors to the crew's gambling operation, and collected losses and paid winnings to their bettors for the crew. Agents received a commission of 25% of the net losses of their bettors.

14. The crew collected unlawful debts from Curt Bullock, Henry Erfurth, Roy Salerno, Steve Walton, Les Perrelli, Angelo Parhas, Tony Belville, Edward Muisenga, Nick Gerodakis, James Wolf, Jack Duff, and Thomas Piccietti. Parhas, Bel-

ville, and Gerodakis were given juice loans when they could not pay off their gambling debts. Covone arranged for Ed Muisenga to receive a juice loan from a non-crew member to pay off his gambling debt to the crew. Les Perelli and Nick Koritsaris received juice loans from DeLaurentis separate from any gambling debts. Undercover agent Larry Weeks also received a juice loan from Infelise and DeLaurentis to bribe a Wisconsin public official.

15. For example, Marino provided juice bankrolls to Mike Pascucci and Nicholas, and made juice loans to bookmaker Dominic Basso. Infelise and Marino provide a juice bankroll to James Basile and Sarno collected the crew's share from Basile

Beginning in approximately 1974, the crew also sought to control all independent sports bookmaking businesses, particularly in northern Cook, Lake, and McHenry Counties, Illinois.[16] The crew forced independent bookmakers to either pay the crew a monthly street tax, make the crew a partner in their bookmaking business, or get out of the business. Partnerships were usually 50% partnerships by which the crew and the bookmaker would share profits and losses on a 50/50 basis.

In the late 1970's and early 1980's, the crew expanded this operation to include collecting street tax from houses of prostitution and adult book stores. During the early 1980's, the crew also attempted to take over independent parlay card gambling businesses and independent high stakes card games. Violence or the threat of violence was used by crew members to maintain control over the independent operators.[17]

The Ferriola Street Crew also made great efforts to conceal their illegal activity. For example, the crew provided monetary payments to imprisoned members who refused to testify against the crew. During the grand jury investigation of this case, crew members Garrison, Nicholas, John Caulderullo, and Anthony Petronella, and street tax victim Chuck Cesario were subpoenaed to testify, asserted their Fifth Amendment privilege, were immunized, and still refused to testify before the grand jury. All five were

ultimately incarcerated for civil contempt. While incarcerated, they received cash payments which were deducted from the crew's profits.[18] Crew members Jahoda, Harry Aleman, and Jerry Scalise also received cash payments from the crew during or after their imprisonment for various offenses.[19]

Crew members also instructed potential grand jury witnesses to lie. For example, DeLaurentis told street tax victim Gerry Otto to lie to the grand jury. Infelise and R.J. McDonnell joked about the "story" agent Navorat Boonpituck told to the grand jury. And, DeLaurentis and DiDomenico created a story for undercover agent Larry Weeks [20] to tell authorities if he was contacted regarding their Lake Geneva bribery scheme.

In addition, crew members attempted to and bribed police officers, judges, and other political officials to assure the acquittal of crew members indicted on criminal charges and for police protection for the crew's gambling operation.[21] For example, in 1977, Robert Cooley fixed a murder trial for Aleman. On Pat Marcy's instructions, Cooley paid $10,000 to the presiding judge to fix the case.[22] Aleman was subsequently acquitted in a bench trial.

In 1981, Ken Eto made a series of monthly $1,000 payments to John Monteleone through Infelise and Marino. These payments were

---

each month. DeLaurentis also provided a juice bankroll to Damopoulos.

**16.** Independent bookmaking operations are those not affiliated with any street crew.

**17.** Victims of these extortionate activities included: Vince Rizza, Tony Reitinger, Steve Hospodar, Sam Sammarco, Pat Gervais, Phil Caliendo, Kenton Pielet, Jack O'Brien, Joe Ken Eto, Sam Malatia, Chuck Cesario, George Miller, Chuck Romano, Michael Adams, Greg DiPiero, Ed Cauley, Joseph Pascucci, Gerry Kurth, John Larsen, Dave Puhl, Robbie Hildebrandt, Hal Smith, Phil Janis, Bill Martino, Gerry Otto, Nick Koritsaris, Peter Aivaliotis, John Katris, Thomas Skryd, James Bollman, Robert Garrison, and Spiros Tzivas.

**18.** Nicholas, Caulderullo, and Petronella each receive $1,000 per month, Covone received between $1,500 and $2,000 per month, and Cesario receive $500 per month. Nicholas also receive a $75,000 cash payment from DeLaurentis repre-

senting his share of the gambling profits earned by the crew during his imprisonment.

**19.** Jahoda's wife and girlfriend received monthly payments from Infelise, Marino, and DeLaurentis while he was imprisoned for federal income tax violations in 1980–1981. Aleman received a lump sum cash payment of $100,000 from Infelise after serving nearly 12 years in prison. Scalise received monthly payments from Infelise after his imprisonment in England for participating in a major jewel theft.

**20.** Larry Weeks was the street name used by undercover agent Larry Kaiser.

**21.** Police protection consisted of advance notice of police raids and arrests.

**22.** Marcy's role in the crew was to attempt to fix criminal cases against crew members and associates by arranging the reassignment of their cases to a corrupt Judge.

to buy police protection from the Vice Control Division of the Chicago Police Department for Eto's monte game.

In 1982, Pat Gervais paid a total of $12,000 to the crew for permission to operate his house of prostitution in Lake County, Illinois. DeLaurentis and Marino told Gervais that his $3,000 per month payment would take care of the crew and the Lake County Sheriff's Department, and that the sheriff's department would give him advance warning of any raids or investigations. Gervais received such a warning about a raid in March 1982.

Also in 1982, Infelise instructed Jahoda to give him $1,500 per month out of the Rouse House casino profits so that he could bribe the Lake County Sheriff to get advance notice of raids. Infelise told Jahoda that Ferriola had a contact in the sheriff's department and Infelise had a "hot phone" installed in the casino where the advance raid warnings would be received.

From 1982 through the fall of 1986, the Outfit and the Ferriola Street Crew also controlled the issuance of liquor licenses through Steve Bayovich, the Liquor Control Commissioner in Cicero, Illinois. This was originally accomplished through Bucky Ortenzi, but after Ortenzi's death in 1986, Infelise took over for him. In 1986, Infelise agreed to obtain a Cicero liquor license for a client of Robert J. McDonnell. During this period, monthly bribe payments were made to Bayovich.

In 1986, Infelise, through Pat Marcy and others, bribed his federal probation officer by finding the probation officer's son a job. The probation officer's son interviewed with Frank Maltese and Dino Marino, Louis Marino's son and a high ranking employee at the Town of Cicero Department of Public Works ("DPW"), and was ultimately employed by DPW.

In 1987, DeLaurentis informed Jahoda that he paid $1,000 per month to the Forest Park Police Chief to protect the crew's floating craps game. Shortly thereafter, Infelise told Jahoda that the game had been moved to the Argo/Willow Springs area and that protection money was being paid there.

In 1988, Infelise told Jahoda that he had been giving $5,000 per month to Undersheriff of Cook County James Dvorak to be forwarded to the Cook County Sheriff for protection. In the fall of 1988, Infelise told Jahoda that this payoff had been increased to $10,000 per month. In September 1989, Infelise again confirmed to Jahoda that the crew was paying Dvorak monthly payoffs and that $35,000 in crew funds were being paid each month to incarcerated crew members and "the coppers."

In February 1988, Jahoda was arrested by the Illinois State Police for operating a blackjack game at the Arlington Hilton Hotel in Arlington, Illinois. From the time of his arrest through the fall of 1989, Jahoda had a series of conversations with Infelise, DeLaurentis, and Maltese regarding payoffs they were offering to three Cook County judges to fix Jahoda's case. Infelise told Jahoda that he believed something could be done to have the first judge on the case, Judge Christy Berkos, take care of Jahoda's case.

In the summer of 1988, Maltese told Infelise and Jahoda that he had met with Berkos and that Berkos was holding out for a trip for two to Hawaii. Berkos denies having been offered a bribe, but acknowledges that he received strange contacts while assigned to Jahoda's case. In early 1989, Berkos recused himself from the case because he knew one of Jahoda's family members. The second judge on the case, Judge Thomas Hett, also recused himself during the summer of 1989 because he knew one of Jahoda's family members. After Hett's recusal, Infelise told Jahoda that Maltese had met with Hett and that Hett would have been given $7,500 to take care of the case. Later, Infelise and DeLaurentis told Jahoda that the third judge assigned to his case, Judge Richard Neville, would be paid $10,000 to fix the case. According to Infelise, Pat Marcy was to handle it. The State eventually dismissed the case on its own motion.

In September 1989, Garrison wanted to run a regular high stakes poker game in Lake County, Illinois. DeLaurentis gave him permission to operate this game on the condition that Garrison pay the crew half of

his profits and $250 per month for police protection.

Also in 1989, at DeLaurentis' request, Rocco Pellettiere attempted to make a payoff to DeLaurentis' former brother-in-law, Lake County Deputy Sheriff Willie Smith. Pellettiere offered Smith $500 per month for his approval to place DeLaurentis' joker poker machines in certain Lake County bars and early warning of any police raids on those bars. DeLaurentis later confirmed to Jahoda his belief that Smith had been bribed to permit them to operate illegal gambling activities in Lake County, Illinois.

Every Christmas, Infelise also instructed Jahoda to give him or DeLaurentis money from the bookmaking business to payoff various individuals in the Cook County Sheriff's Department. Upon DeLaurentis' demand, Lake County bookmaker Gerry Otto also paid $1,000 per year into this "Christmas fund." These payoffs ranged from $1,500–$5,000 per year.

Infelise, DeLaurentis, and Jahoda also engaged in a scheme with undercover agent Larry Weeks to bribe a local Wisconsin zoning official to gain favorable treatment in their efforts to get commercial/industrial property near Lake Geneva, Illinois zoned as residential property. This bribe was to be financed by a $50,000 juice loan to Weeks from funds provided by Infelise, DeLaurentis, and Jahoda. At Infelise's direction, Jahoda obtained the $50,000 to give Weeks from money Spano kept for the crew at Flash Trucking. Jahoda then repaid Infelise for his and DeLaurentis' share of the juice loan. DiDomenico subsequently delivered DeLaurentis' share of the loan to reimburse Jahoda.

Some members of the crew were also responsible for conspiring to murder independent bookmaker Hal Smith.[23] Since at least 1981, Smith was aware of the efforts of the Ferriola Street Crew, particularly Marino and DeLaurentis, to impose a street tax on independent bookmakers in Lake County or force them to become partners with the crew. Smith resisted these efforts. In March 1983, the IRS seized $600,000 in cash from Smith's home during a highly publicized raid. After this raid, the crew stepped up its efforts to gain control over Smith's bookmaking operation. For six months in 1983, Smith and his partners, Dave Puhl and Phil Janis, paid DeLaurentis $3,000 per month in street tax.

In the fall of 1983, DeLaurentis arranged a meeting with Janis and Robbie Hildebrandt, one of Smith and Janis' phone clerks. At this meeting, DeLaurentis told Janis and Hildebrandt that they and Smith would have to pay street tax. When Hildebrandt told Smith about the meeting, Smith said "fuck that little guinea" and told Hildebrandt that he would take care of it. Janis retired to Florida shortly thereafter.

In late February or early March 1984, DeLaurentis again contacted Hildebrandt about paying street tax. At a subsequent meeting, DeLaurentis told Hildebrandt and Smith that Smith had to pay $6,000 per month in street tax. Smith offered $3,000 and then $3,500, but DeLaurentis refused these offers. Smith then said, "Now you get nothing." A very loud and public argument ensued in which Smith made numerous ethnic slurs about DeLaurentis. DeLaurentis told Hildebrandt that he was going to get a "slap" and told Smith that he was going to be "trunk music." Smith's refusal to pay street tax motivated some members of the crew to conspire to kill him.

In the spring of 1984, Infelise asked Jahoda to show him where Smith lived. Thereafter, Infelise, Marino, and Bellavia went look-

---

**23.** At trial, Infelise and Bellavia were found guilty of conspiring to murder Hal Smith under Racketeering Act 17(a). DeLaurentis was found not guilty on this count, and the jury could not reach a verdict on this count with respect to Marino and a mistrial was declared. Infelise, Bellavia, Marino, and DeLaurentis were also charged with murdering Hal Smith under Racketeering Act 17(b). The jury could not reach a verdict on this racketeering act for any of these defendants and a mistrial was declared.

Infelise, Bellavia, Marino, and DeLaurentis were also charged in Count 8 with conspiring to murder Hal Smith and in Count 9 with murdering Hal Smith. The jury found DeLaurentis guilty on Count 8, but this conviction was vacated by this court and a mistrial declared on December 30, 1992. The jury could not reach a verdict on Count 8 with respect to Infelise, Bellavia, and Marino. The jury also could not reach a verdict on Count 9 with respect to Infelise, Bellavia, Marino, and DeLaurentis.

ing for Smith. Infelise asked Jahoda to set up meetings with Smith so that they could observe him. In the fall of 1984, Infelise instructed Jahoda to keep in contact with Smith.

On or about February 5, 1985, Infelise ordered Jahoda to bring Smith to Jahoda's house in Long Grove, Illinois. Jahoda arranged for Smith to meet him at a bar on February 7, 1985. Jahoda reported this arrangement to Infelise and told Infelise that he would try to get Smith to come back to his house with him.

On February 7, 1985, Infelise, Marino, and Bellavia came to Jahoda's house. Infelise told Jahoda that only he and Smith should come to his house, preferably in Smith's car, Smith should enter the house alone through the kitchen, and Jahoda should try not to go in the house. Later that day, Jahoda met Smith at the bar and brought him back to his house as instructed. Jahoda told Smith to go in through the kitchen while he pretended to go over to his mailbox. Jahoda saw Infelise, Marino, and Bellavia in the house after he arrived with Smith. The last time Jahoda saw Smith, he was dazed and slumped on the floor with Infelise, Marino, and Bellavia surrounding him.

Later that evening, Jahoda returned home and found his house empty. Jahoda noticed that part·of the kitchen floor had been mopped. Infelise then called Jahoda and told him to look for a cigar and glasses which Marino thought had been left behind. Jahoda looked for these items but could not find them. Both items were later recovered from Smith's car by the Arlington Heights Police. Jahoda left for Mexico the next day.

Smith's body was found in the trunk of his car on February 10, 1985. The coroner who examined Smith's body concluded that Smith died of strangulation. The coroner also found that Smith had been tortured because Smith had been severely beaten about the head and face, he had numerous superficial incisions and cuts in his neck and chest, and his throat was slit. None of these cuts were fatal.

While in Mexico, Jahoda received a phone call from Infelise who told him that Smith's body had been found. After Jahoda returned from Mexico, he met with Infelise. Infelise told him that they were all "hot" because of "that thing," and Jahoda was particularly hot. Infelise commented that the murder of Chuckie English was a good distraction and would take the heat off the Smith murder. In subsequent conversations, Infelise told Jahoda that Smith was a snitch and Ferriola wanted to thank him for "that Smith thing."

While working as a government informant, Jahoda obtained consensually recorded conversations with Infelise and Bellavia regarding Smith's murder.[24] Jahoda told them that "Officer Friendly," a supposed crooked police officer, had passed on bits of information about the Smith murder investigation to him. On October 25, 1989, Jahoda showed Infelise a list of clues supposedly gathered by the police regarding the murder, including cigarette evidence left at the crime scene and a reference to the route the police believed Smith's car took the night he was murdered.

After reading the list, Infelise stated: "when you tell me something like this, you think I could go home and sleep, without having this information? It might not be important to you, but maybe I know more than you do. Do you understand, you know?" Infelise also questioned the accuracy of the police notes on Smith's car. He stated: "The car, right? It come from there to your house. It went all the way to mother fuckin' Arlington Heights. That's where they found the car. So how could the speedometer only have three miles on it." Government Exhibit 453.

On October 30, 1989, in a consensually recorded conversation, Bellavia and Jahoda also discussed the Smith murder. Jahoda discussed his concern that little clues might have been inadvertently left which would trace the murder to them:

> Jahoda: Here's a fucking success. I just want to point out an error or two. He should never have picked up that phone.

---

24. No conversations between Jahoda and the other defendants charged with conspiring to murder and murdering Hal Smith were recorded.

The biggest break we got is the next day. I don't know if he told you this. Cook County's all over my house. I'm already turned in as, as a missing person.

Bellavia: Yeah.

Jahoda: I got a guy in the house that won't let them in.

Bellavia: Yeah.

Jahoda: And who knows what the hell was in there?

Bellavia: Yeah.

Jahoda: Whoever brought the, the, the rope. I mean, I know everybody's got gloves. What the fuck? But when that rope was bought, it wasn't bought with gloves on. The fucking bag was there. The wrapper was there. The receipt was there. True Value Hardware or whatever. I mean, I, you know, it's just the little things. (Inaudible).

Bellavia: Yeah, right. Them are the little things that, ah ...

Jahoda: You know, who, whoever, did the floor leaves the fucking mop. You got to make sure that you use gloves, if, if I don't come home that night. If I catch that plane in the morning, which I almost did. I almost stayed at a broad's house.

Bellavia: Yeah.

Jahoda: Cuz I had my luggage. I almost never went home. So fortunately I was there to tidy up.

Bellavia: There's things that you can be, there's things you can be so careful about, and yet there's little, little things.

Jahoda: Cuz I know that, that there was either, you know, I don't wanna know where it came from, you know, Bobby Salerno or yourself. Just, just learn from our successes.

Bellavia: That's right. That's right.

Government Exhibit 457 at 16–17. Later on during the course of this conversation, Jahoda and Bellavia continued their discussion of Smith's murder:

Jahoda: I mean I'm talking about the period. He just never told me a God damn thing.

Bellavia: Well, as a rule they should, but they don't, you know. When a guy's got bones.

Jahoda: He drove me back to the tavern and said, "Burn your clothes and leave. He doesn't say how long you guys are going to be [at Jahoda's house with Smith] or where's he's going.

Bellavia: Yeah.

Jahoda: You know what I mean? Like, I know, that, that guy [Smith] ain't' there to buy tickets to the, to the Knights of Columbus Smoker.

Bellavia: (Laughs).

Jahoda: But in my wildest dreams, I don't picture him getting fucking sliced and diced in the kitchen, either.

Government Exhibit 457 at 20–21. Bellavia further assured Jahoda that Smith was only in the kitchen so he did not have to worry about evidence turning up in another room of Jahoda's house. Jahoda asked: "Except I just want to know one thing. Was that, that guy any place but that kitchen? He never left the kitchen." Bellavia told him "No." When Jahoda stated: "So, all I know is I sterilized that kitchen, but I never went past that kitchen. Kitchen and that side bathroom," Bellavia again responded: "No, that's all. That was it." Government Exhibit 457 at 32–34.

### B. Defendants Infelise's and Bellavia's Roles in the Ferriola Street Crew

The Ferriola Street Crew's organization consisted of a "boss" or leader, assistants to the boss, supervisors of the various income producing activities, and many agents and employees who were compensated out of the earnings from those activities. From 1974 until his death in 1979, James Torello was the boss, from 1979 until his death in 1989 Joseph Ferriola was the boss, and from 1989 through the indictment of this case defendant Infelise was the boss of the Ferriola Street Crew. Supervisors of the street crew included, at various times, trial defendants Marino, Bellavia, and DeLaurentis.

For approximately 11 years, in his capacity as the chief assistant to the street crew boss and as the street crew boss, Infelise oversaw the above described illegal activities of this

sophisticated criminal organization, including coordinating and directing its gambling businesses and its street tax and juice loan activities, and supervising and participating in the bribery of law enforcement officers, judges, and public officials. Upon becoming the crew boss, Infelise also coordinated and "refereed" criminal activities of other street crews.

Beyond Infelise's general role in the Ferriola Street Crew's activities described above, Infelise took part in various other activities which must also be considered when reviewing Infelise's guideline computations. For example, Kenton Pielet acted as a 50/50 bookmaker for the crew starting in the summer of 1979 and as a 25% agent during the basketball season of 1980. During the football season of 1979, Pielet had approximately 50 betting football customers who lost approximately $102,000. One of Pielet's bettors, Larry Holler, lost $26,000 in one week. After there were difficulties in collecting Holler's debt and Holler indicated that he was going to refuse to pay, a meeting was set up between Holler, Pielet, Marino, and Zitello. Holler paid off the $26,000 at this meeting.

Holler was permitted to continue betting during the basketball season of 1980 and ultimately lost over $13,000. After Holler did not pay off his debt, a meeting was set up between Pielet, Infelise, and Marino. At this meeting, Pielet told Infelise that he tried to collect Holler's debt, but that Holler did not have the money. Infelise told Pielet that he was responsible for Holler's debt. When Pielet laughed at this suggestion, Marino slapped him on the face. Infelise then told Pielet that he would have to collect the debt and pay $500 per month in street tax. According to Pielet, he agreed to make the street tax payments because the slap by Marino scared him. Pielet subsequently switched to another street crew run by Sam Carlisi. This change in crew membership only occurred after Pielet obtained permission to switch and Holler's $13,000 debt was resolved.

Before becoming involved with Infelise and his crew, Patrick Gervais had a street tax relationship with Victor Spilotro, a boss from another crew. But, within a week of opening a house of prostitution in Lake County, Illinois, Gervais received a phone call from DeLaurentis advising him that he would have to pay a $3,000 per month street tax to the Ferriola Street Crew. When Gervais spoke with Spilotro about the phone call, Spilotro told Gervais not to pay DeLaurentis because "he had the muscle." Marino subsequently set up a meeting with Gervais which Spilotro also attended. When Marino and Infelise showed up for the meeting, Spilotro looked surprised to see Infelise. After Spilotro and Infelise had a brief, private discussion, Spilotro told Gervais that "I am out" and that Gervais' house of prostitution was "in their territory." Spilotro also told Gervais that he would have to deal with Marino. After Infelise's intercession, Gervais began paying street tax to the Ferriola Street Crew. Gervais paid a total of $12,000 to the crew to protect his Lake County house of prostitution.

George Miller, Jr. was an independent bookmaker who worked with bookmaker Hal Smith during the late 1970's. In 1980 or 1981, Miller broke away from Smith and began working as an independent bookmaker in Lake County with his father George Miller, Sr. The Millers also ran a lucrative parlay card business during this time. In 1982, Infelise, Marino, and DeLaurentis decided to take over the Millers' operation. A meeting was arranged between the Millers, Infelise, Marino, and DeLaurentis. At the meeting, Marino told the Millers that they had to split their business with them. If they did not join the crew, Infelise told them that they would smash their parlay card printing press. Marino further told them that the Ferriola Street Crew was taking over Lake County.

After this meeting, the Millers discussed their situation with other bookmakers and learned about DeLaurentis' reputation as a mob enforcer. At a second meeting with Infelise, Marino, and DeLaurentis, George Miller told them that he would join the crew's business. Infelise, Marino, and DeLaurentis subsequently took over the Millers' business on a 50/50 basis and employed George Miller in one of their wire rooms. In 1982, the crew received $75,000 for their 50%

interest. After 1982, George Miller basically got out of the parlay card business, but De-Laurentis warned him that if he ever got back into parlay cards again, it had "better be with us."

In the summer of 1983, Roy Salerno, one of George Miller's bettors, lost $100,000 in baseball wagers to Miller. Miller eventually turned the debt over to Jahoda who in turn advised Infelise about the debt. Infelise told Salerno that he would have to make monthly payments of $1,500 until the debt was paid off. Marino, DeLaurentis, and later, Bellavia collected these payments from Salerno for several years until Infelise "cashed out" the debt for approximately $10,000–$15,000. Miller did not receive any of the money collected by the crew.

Income from the crew's illegal activity was approximately $10 million from 1979 through 1988. Infelise earned close to $2 million from this income. Infelise took numerous steps to conceal the profits he and the crew earned from their illegal activities. For example, Infelise invested $700,000 in cash in a Florida property titled in the name of his mother-in-law. Infelise and Bellavia also proposed another real estate deal to Jahoda in which he hoped to hide his $200,000 investment.

Prior to 1986, Bellavia was one of Infelise's trusted friends and associates. By 1986, Bellavia was a regular crew member who was paid $500 per week. Bellavia was involved in most aspects of the crew's business. For example, Bellavia was involved in the crew's juice loan operation. In 1986, Bellavia arranged to receive $5,000 per week from the crew to use for juice loans. If one of Bellavia's customers failed to make his payment, Bellavia was responsible to the crew for that payment. Bellavia also collected monthly street tax payments from bookmaker Roman Lewis for crew supervisor Gerry Scarpelli during 1986. At one point, Lewis paid $2820 per month.

In 1989, after Ferriola died and Infelise became the boss of the crew, Infelise promoted DeLaurentis to street boss and Bellavia and Marino to his assistants. Like Infelise, Bellavia went to great lengths to hide his extensive involvement and the income he earned from his participation the crew. For example, Bellavia, Infelise, and Jahoda became involved in the purchase of a partially built condominium project in Addison, Illinois. Bellavia predicted a profit of between $500,000–$800,000 in the first year alone. The profitability of the deal was to be due in large part to Infelise's ability to influence a corrupt union official to allow non-union labor to be used. A construction loan was also to be arranged through a corrupt banker who would also be sharing in the profits from this real estate venture. Bellavia made it clear to Jahoda that the property would be held in the names of nominees he controlled because "we got to be under the covers." One of the main reasons for the undercover condominium venture was to create a hidden nest egg in the event that Bellavia, Infelise, and Jahoda went to jail.

Bellavia was also involved in the crew's sports bookmaking business and floating blackjack games. Bellavia acted as a 25% agent for the blackjack games. He also supervised the bookmaking activities of sub-bookmaker Freddie Braun. Braun had been a 50/50 bookmaker supervised by crew member Bucky Ortenzi. When Ortenzi died in 1986, Bellavia became responsible for collecting the crew's 50% share of Braun's profits. Bellavia also assisted the business by obtaining mobile telephones and service connections from Michael Frietag, a salesman for Illinois Communications Company. Bellavia referred Frietag to Zitello who, acting under a fictitious name, purchased several mobile telephones and service connections. Frietag later supplied Jahoda with more mobile telephones under a variety of fictitious names. Bellavia also referred Frietag to crew members and bookmakers, including Ferriola, Donald Angelini, Dominic Cortina, Roman Lewis, as well as Anne Infelise, Rocco Infelise's wife.

Bellavia also collected gambling debts for the crew. As previously explained, Roy Salerno, one of bookmaker George Miller's bettors, lost $100,000 in baseball wagers in the summer of 1983. Salerno's debt was eventually turned over to Infelise who arranged for Salerno to make monthly $1,500 payments until his debt was paid off. These collections

were originally assigned to Marino and De-Laurentis, but they were later taken over by Bellavia. When Bellavia was in California on business, he would have his son, Chuckie Bellavia, pick up Salerno's payments. Infelise later cashed out Salerno's debt for approximately $10,000–$15,000.

### The Objections to the PSIs and The Government's Motion for Upward Departure

#### A. Joint Objections

The jury in this case found Infelise and Bellavia guilty of Racketeering Act 17(a) which charged them with conspiring to murder Hal Smith. Infelise's and Bellavia's probation officers found that, pursuant to U.S.S.G. § ("Section") 2A2.1,[25] the base offense level for this conviction was 20. The probation officers also assigned defendants enhancements for more than minimal planning, use of a dangerous weapon, and severe bodily injury to the victim of the conspiracy. These enhancements brought Infelise's and Bellavia's base offense levels for this conviction up to 31. With the addition of enhancements for being an organizer or leader under Section 3B1.1[26] and obstruction of justice under Section 3C1.1,[27] the probation officer calculated Infelise's total adjusted offense level to be 37. With the addition of an enhancement for acting as a manager or supervisor under Section 3B1.1, the proba-

tion officer calculated Bellavia's total adjusted offense level to be 34.

The government argues that this court should not rely on Section 2A2.1 in this instance. Rather, the government contends that this court should rely on the current version of the Sentencing Guidelines, Section 2A1.5(c)(1), which provides that the proper offense level for this conviction is 43, the highest offense level established under the sentencing guidelines.

Section 2A1.5(c)(1) (Conspiracy or Solicitation to Commit Murder) provides:

(a) Base Offense Level: 28 . . .

(c) Cross References

(1) If the offense resulted in the death of a victim, apply § 2A1.1 (First Degree Murder).

Under Section 2A1.1(a), the base offense level for First Degree Murder is 43. Since Hal Smith died as a result of the conspiracy to commit his murder as charged in Racketeering Act 17(a), the government argues that this guideline provision should be applied.

In the alternative, the government argues that even if the former version of the sentencing guidelines is applied, additional enhancements should be added which bring Infelise's and Bellavia's offense levels for Racketeering Act 17(a) up to 35.[28] With the generally applicable enhancements assigned

25. Section 2A2.1 provides:

 (a) Base Offense Level:
 (1) 28, if the object of the offense would have constituted first degree murder; or
 (2) 22, otherwise.
 (b) Specific Offense Characteristics
 (1)(A) If the victim sustained permanent or life-threatening bodily injury, increase by 4 levels; (B) if the victim sustained serious bodily injury, increase by 2 levels; or (C) if the degree of injury is between that specified in subdivisions (A) and (B), increase by 3 levels.
 (2) If the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, increase by 4 levels.

26. Section 3B1.1 provides:

 Based on the defendant's role in the offense, increase the offense level as follows:
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

27. Section 3C1.1 provides:

 If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

28. The government claims that Infelise and Bellavia should be assigned a two point enhancement pursuant to Section 2A2.1(b)(4) due to the pecuniary motive for Smith's murder and a two point enhancement pursuant to Section 3A1.3 because Smith was restrained during the course of his murder/torture.

by the probation officers, Infelise's total adjusted offense level would be 41 and Bellavia's would be 38. The government then argues that this court should upwardly depart to a level 43, the highest offense level available under the guidelines, pursuant to Section 5K2.1.[29]

Infelise and Bellavia agree with their probation officers that this court should follow the former version of the sentencing guidelines and apply Section 2A2.1. According to Infelise and Bellavia, applying the former version of the guidelines avoids the constitutional questions of double jeopardy which the current version of the guidelines raises. While agreeing with the probation officers that Section 2A2.1 applies, Infelise and Bellavia object to the various enhancements assigned for this offense. Infelise and Bellavia also object to the government's proposed additional enhancements to Section 2A2.1 and to the government's motion for an upward departure.

■ While the jury did not reach a verdict on Racketeering Act 17(b) and Count 9 which charged Infelise and Bellavia with murdering Hal Smith, the government's suggested application of Section 2A1.5 and its motion for an upward departure presume that Smith died as a result of Infelise's and Bellavia's actions. When reviewing evidence at sentencing, the Seventh Circuit has clearly established that it is appropriate to apply the preponderance of the evidence standard. *See United States v. Masters,* 978 F.2d 281, 286–87 (7th Cir.1992); *United States v. Duarte,* 950 F.2d 1255, 1263 (7th Cir.1991). Based upon this court's careful review of the evidence presented regarding the conspiracy to murder Hal Smith, this court is persuaded that the government has shown by a preponderance of the evidence that Infelise and Bellavia should be held accountable for Hal Smith's death.

As thoroughly explained in the background section of this opinion, Jahoda testified extensively about the stalking and conspiracy to murder Hal Smith. Jahoda testified that Smith refused to pay the street tax the crew demanded, and it was this refusal which motivated crew members to conspire to murder Smith.

Jahoda also testified that, as ordered by Infelise, he brought Smith to his house on February 7, 1985 and left him there with Infelise, Bellavia, and Marino. Jahoda last saw Smith on the kitchen floor in a dazed and slumped manner with Infelise, Bellavia, and Marino standing over him. When Jahoda returned home later that evening, he noticed that part of the kitchen floor had been mopped. Three days later, February 10, 1985, Smith's body was found in the trunk of his car. During the course of the police investigation into Smith's murder, Jahoda also participated in various recorded conversations with Infelise and Bellavia regarding their involvement in Smith's murder. Such extensive evidence is clearly sufficient to prove by a preponderance of the evidence that Smith's death resulted from the conspiracy to murder him of which Infelise and Bellavia were found guilty. Therefore, despite Infelise's and Bellavia's denials, this court finds that Smith's death can be considered for sentencing purposes.

Having determined that there is sufficient evidence demonstrating that Smith's death was the result of the conspiracy to murder him as charged in Racketeering Act 17(a), the remaining question is how Infelise's and Bellavia's sentences should reflect this conclusion. As noted above, the government has suggested two ways to calculate defendants' sentences to account for Smith's death. Based on the Seventh Circuit's recent ruling in *Masters,* 978 F.2d 281, an extremely similar case, this court finds that both calculations proposed by the government are appropriate. Under *Masters,* there is also a third way to calculate defendants' adjusted offense levels which results in the same total offense score.

In *Masters,* defendant had been sentenced by Judge Zagel to 40 years in prison for racketeering activities which ran from protecting bookies to soliciting his wife's mur-

---

**29.** A total adjusted offense level of 43 requires a sentence of life in prison. *See* U.S.S.G. Sentencing Table.

der. Defendant subsequently requested and was granted the opportunity to be resentenced under the sentencing guidelines.[30] At resentencing, Judge Zagel again sentenced defendant to 40 years in prison, but since this sentence was under the sentencing guidelines, defendant lost the opportunity for parole which was available under his first sentence. *Id.* at 282. It is the appeal of this guidelines sentence which is so pivotal to this court's determination in this case. *See Masters,* 978 F.2d 281.

Judge Zagel calculated defendant's sentence in three ways and each of the three depended to some degree on his finding that defendant was directly responsible for his wife's murder despite the jury's failure to answer a special interrogatory asking about the murder. First, Judge Zagel relied on Section 2A2.1 to establish a base offense level of 20. The Judge then added 2 points for more than minimal planning, 9 points for the use of a firearm to inflict bodily injury on defendant's wife, and 2 points for paying money to other persons in connection with the crime, thus arriving at an offense level of 33 within Section 2A2.1 itself. Then, relying on generally applicable enhancements, Judge Zagel added 2 points because defendant's wife was physically restrained, 2 points because defendant was the organizer or leader of the conspiracy, and 2 points for obstruction of justice. Since nothing in this computation reflected defendant's wife's death and Judge Zagel had determined that defendant was responsible for her death, the Judge concluded that, pursuant to Section 5K2.0, an upward departure of 4 levels to level 43 was appropriate so that defendant would ultimately receive a 40 year sentence. *Id.* at 283–84.

Second, rather than relying on the guideline for conspiracy to commit murder like under the first method, Judge Zagel turned to the guideline for murder, Section 2A1.1. Since the base offense level for murder was 43, Judge Zagel concluded that a sentence of 40 years was appropriate because it came as

close to life imprisonment as possible under the circumstances of the case. *Id.* at 284.

Third, Judge Zagel relied on the recent amendment to the sentencing guidelines which moved conspiracy to commit murder from Section 2A1.1 to Section 2A1.5. Under this new section, defendant's offense level was automatically 43. *Id.*

Upon review of these three calculation methods, the Seventh Circuit stated: "Like the district judge, we conclude that Method 2 is proper. Methods 1 and 3 reinforce this result, demonstrating the (rough) internal consistency of the guidelines." *Id.* Moreover, the appellate court stated that the only way for defendant to make any headway in attacking Judge Zagel's sentence would be to upset the Judge's finding that defendant was responsible for his wife's murder. *Id.* at 285. Defendant argued that it was not appropriate to hold him accountable for his wife's death when the jury left the special interrogatory regarding whether defendant solicited his wife's murder and participated in the overall racketeering enterprise blank. The Seventh Circuit responded:

> Our dispute concerns the selection of a sentence for the crime of conspiracy. A sentence at the top of the statutory range does not punish Masters for a crime he didn't commit; it uses all available information about his character and dangerousness in choosing the sentence for the crime of which he stands convicted. Judges have been considering defendants' activities and character since long before there were guidelines, with consistent approval from the highest court. This is one reason why we have held that judges may take other crimes into account when selecting a sentence under the guidelines, even if the defendant has been charged with and acquitted of those crimes. An acquittal means that the charge was not proven beyond a reasonable doubt; it does not mean that the defendant didn't do it.

*Id.* at 285–86 (citations omitted).

Finally, Masters argued that a more exacting standard than the preponderance of the

---

**30.** The *Masters* defendant had received the maximum sentence for the crimes of which he had been convicted—consecutive 20-year terms—and believed that the guidelines required a lower sentence. 978 F.2d at 282.

evidence should be required before he could be held accountable for his wife's death. However, the Seventh Circuit overruled this argument because it found that the application of this standard at sentencing adequately satisfies the due process clause. *Id.* at 286 (citing *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986)). The appellate court concluded: "Finding murder by a preponderance of the evidence violated none of Masters' rights." *Id.* at 287.

The instant case is strikingly similar to *Masters* and therefore, this court is bound by the Seventh Circuit's ruling in that case. Like *Masters,* Infelise and Bellavia were found guilty of conspiring to murder Hal Smith, but the jury could not reach verdicts on the counts charging them with Smith's murder. Also like *Masters,* sufficient evidence has been presented to prove by a preponderance of the evidence that Infelise and Bellavia were responsible for Smith's death. Given the similarities between *Masters* and the instant case, this court finds that each guideline calculation method relied upon by Judge Zagel and approved by the Seventh Circuit in *Masters* is, as the government has suggested, equally applicable to the guideline calculations for Infelise and Bellavia in this case.

Applying Judge Zagel's first method, the base offense level for Section 2A2.1 is 20. The probation officers assigned Infelise and Bellavia an additional 11 points for more than minimal planning, use of a dangerous weap-

on, and the infliction of permanent or life threatening bodily injury to the victim, all pursuant to Section 2A2.1, which brings defendants' adjusted offense level for Racketeering Act 17(a) up to 31.

■ Infelise and Bellavia argue that enhancements established under Section 2A2.1 (Assault With Intent to Commit Murder; Attempted Murder) cannot be applied in this instance because defendants were neither charged with nor found guilty of assaulting Smith. This court disagrees. Enhancements for more than minimal planning, use of a dangerous weapon, and degree of bodily injury are applicable where, as here, an assault occurred during the course of a conspiracy to commit murder. The background notes to former Section 2A2.1 provide:

> Enhancements are provided for planning, weapon use, injury, and commission of the crime for hire. All of the factors can apply in the case of an assault; only the last can apply in the case of a conspiracy that does not include an assault; and none can apply in the case of a mere solicitation.

As the government suggests, because the background notes specifically excluded enhancements for planning, weapon use, and bodily injury where the conspiracy did not result in an assault of the victim, by implication, the guidelines intended to include these enhancements when the relevant conduct of the charged conspiracy included an assault on the victim.[31]

---

31. It is well established in this Circuit that relevant conduct can be considered for sentencing purposes. Application Note 1 to Section 2E1.1 provides that "where there is more than one underlying [RICO] offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2)." Application Note 1(1) to Section 1B1.1 defines the term "offense" as "the offense of conviction and *all relevant conduct* under § 1B1.3 (Relevant Conduct) ..." (emphasis added). And, Section 1B1.3, in pertinent part, provides that relevant conduct includes "all acts an omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense ... or that otherwise were in furtherance of that offense."

The Seventh Circuit has established that a court may increase a defendant's base offense

level to account for "relevant conduct" which was part of the same course of conduct or common scheme as the convicted offense, even if the defendant was not charged with or convicted of carrying out those acts. *United States v. Duarte,* 950 F.2d 1255, 1263 (7th Cir.1991); *United States v. Franklin,* 902 F.2d 501, 504 (7th Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990). To increase a defendant's base offense level for uncharged or unconvicted activities, the court must find by a preponderance of the evidence that those activities were "part of the same course of conduct or common scheme or plan" as the convicted offense. *Duarte,* 950 F.2d at 1263. A court making this determination "should explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activities bore the necessary relation to the convicted offense." *Id.; see also United States v. Jewel,* 947 F.2d 224 (7th Cir. 1991); *United States v. Edwards,* 945 F.2d 1387

■ Sufficient evidence that Hal Smith was assaulted during the course of the conspiracy to murder him has been presented. As explained in the background section of this opinion, Jahoda testified that Smith had been knocked to the floor and was sitting in a dazed state with Infelise, Bellavia, and Marino surrounding him when Jahoda left him at his house. The coroner who examined Smith's body also found that Smith had been tortured because Smith had been beaten about the head and face, he had numerous superficial incisions and cuts in his neck and chest, and his throat was slit. The coroner concluded that none of these cuts were fatal and that Smith died of strangulation. Such evidence adequately proves by a preponderance of the evidence that Smith was assaulted during the course of the conspiracy to murder him. This is all that is required for sentencing purposes. *See Masters,* 978 F.2d at 286–87; *Duarte,* 950 F.2d at 1263. In addition, this court notes that the Seventh Circuit has approved the application of such enhancements where a defendant, like Infelise and Bellavia, has been convicted of conspiracy to commit murder. *See Masters,* 978 F.2d 281. Therefore, this objection to the application of these enhancements is overruled.

■ Infelise and Bellavia also argue that enhancements for use of a dangerous weapon and serious bodily injury are not appropriate because while defendants were charged with murdering Hal Smith, defendants were only found guilty of conspiring to murder him. However, this court has already determined that defendants can be held accountable at sentencing for Smith's death despite the jury's inability to reach a verdict on Racketeering Act 17(b) and Count 9 charging defendants with Smith's murder. *See Masters,* 978 F.2d at 286–87.

■ Bellavia also argues that the 4 point enhancement assigned by the probation officers for use of a dangerous weapon is inappropriate because Smith died of strangulation and not wounds inflicted by a sharp instrument such as a knife. Bellavia also

claims that a rope is not, under the law, a dangerous weapon. Former Section 2A2.1(b)(2)(B) provides for the 4 point increase assigned to Infelise and Bellavia "if a dangerous weapon was otherwise used." As this language suggests, Section 2A2.1 does not require the weapon to have caused the victim's death. It only requires the "use" of such a dangerous weapon during the course of the conspiracy.

The government has adequately demonstrated that a dangerous weapon was used during the course of the conspiracy to murder Hal Smith. · As noted above, the coroner who examined Smith's body explained at trial that Smith had numerous superficial incisions and cuts in his neck and chest, and that his throat was slit. The coroner's notes also reflect these findings, often referring · to Smith's wounds as "stab wounds" and "superficial incised wounds".[32] The coroner's findings adequately support the government's contention that a pick-like instrument and a knife were used in the assault/murder of Hal Smith. This evidence is sufficient to warrant an enhancement for use of a dangerous weapon in this instance.

■ The government argues that in addition to these enhancements, Infelise and Bellavia should receive 2 point enhancements pursuant to Section 2A2.1(b)(4) due to the pecuniary motive for Smith's murder. Section 2A2.1(b)(4) provides:

> If a conspiracy or assault was motivated by a payment or offer of money or other thing of value, increase by 2 levels.

The evidence adduced at trial adequately demonstrates that the Hal Smith murder conspiracy was based on a pecuniary motive. The government has demonstrated that Smith resisted the crew's efforts to impose a street tax on his independent bookmaking operation. At one meeting in February or early March 1984, Smith offered to pay the crew half of what DeLaurentis demanded. When DeLaurentis refused this offer, Smith said, "Now you get nothing." A very loud

(7th Cir.1991); *United States v. Morrison,* 946 F.2d 484 (7th Cir.1991). ✱

32. *See* The Government's Summary of Recorded Evidence Concerning the Murder of Hal Smith, Exhibit 1.

and public argument about it ensued during which DeLaurentis told Smith that he was going to be "trunk music."

It was after this meeting that defendants began stalking Smith and it was approximately one year later that he was murdered. Such evidence adequately suggests that it was Smith's refusal to pay the demanded street tax which motivated crew members to conspire to murder Smith. The crew could not let the largest independent bookmaker in the area get away with not paying street tax and flaunting this fact publicly. Not only was the crew losing money on Smith, but it risked having other bookmakers refuse to pay street tax if word got out that Smith was not forced to pay it. Since the evidence presented demonstrates by a preponderance of the evidence that there was a pecuniary motive behind the conspiracy to murder Hal Smith, this court agrees with the government that Infelise and Bellavia should receive two point enhancements under Section 2A2.1(b)(4).

### B. *Objections Only Applicable to Infelise*

■ Infelise objects to the assessment of 4 additional points pursuant to Section 3B1.1(a) [33] because no evidence has been presented by the government which suggests that he was more than a trusted friend of Ferriola for much of the time at issue. At best, Infelise claims that the evidence presented is only consistent with his being an employee or worker in the gambling business. Infelise further argues that while he "had some leadership role with the Ferriola Street Crew," it was not until 1989 when Ferriola died that defendant became the head of the gambling operation.[34] Since Smith was murdered in 1985 and Infelise claims that there is no evidence that he had a leadership role with respect to Smith's death, Infelise argues that it is improper to add 4 points to the offense level for his Racketeering Act 17(a) conviction.

While Infelise may not have been the boss of the Ferriola Street Crew until Ferriola's death in 1989, the evidence presented at trial clearly demonstrates that Infelise played an important leadership role in the organization well before that time. As the government points out, the fact that Infelise was Ferriola's right-hand man hardly diminishes his role as an organizer and leader of the crew. The evidence presented does not indicate that Infelise was merely Ferriola's trusted friend as he suggests. For example, Jahoda testified at trial that, in the late 1970's, when he wanted to end his relationship with Sam Sammarco, Sammarco told Jahoda that he would be "assigned" to Infelise, who was putting his own crew together running the crew's illegal business interests in the north and western suburbs of Chicago.

Testimony was also elicited at trial which demonstrates that Infelise was a leader of the crew's extortionate activities. Kenton Pielet, a former bookmaker for the crew, testified that in early 1980 he was summoned to a meeting with Infelise when one of his bettors fell behind in paying off his wagering debt. Infelise told Pielet that he was responsible for the money and when Pielet laughed, Marino slapped him. Infelise also told Pielet that he would have to pay street tax to continue operating his bookmaking business. Pielet agreed. Pielet also testified that when he wanted to move from Infelise's to Sam Carlisi's crew, he had to get both their permission to make the move. According to Pielet, only after Infelise authorized the move was Pielet allowed to work for Carlisi.

Pat Gervais testified at trial that in early 1982 he was paying street tax to Victor Spilotro, a boss from another crew. Shortly after he opened a house of prostitution in Lake County, DeLaurentis advised Gervais that he would have to start paying street tax to the Ferriola Street Crew. At a meeting originally set up between Gervais, Spilotro, and Marino, Infelise also showed up. After Spilotro and Infelise had a private conversation, Spilotro, despite having previously told Gervais

---

33. Section 3B1.1(a) provides:
 If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

34. Infelise's Objections to the Presentence Investigation at 2–3, ¶ 3.

that he would protect him, told Gervais that he would have to pay the Ferriola Street Crew. After Infelise's intercession, Gervais began paying street tax to the crew.

George Miller also testified at trial that after he and his father began operating an independent bookmaking and parlay card operation in Lake County, Infelise, Marino, and DeLaurentis decided to take over the Millers' operation. At one meeting, Infelise told Miller that if he did not join the crew, his parlay card printing press would be destroyed. Later, Miller agreed to give the crew 50% of his business. Miller also testified that after he began working for the crew, he learned that the daily profit and loss figures for the crew's bookmaking business were regularly reported to Infelise.

Such testimony demonstrates Infelise's consistent involvement and leadership role in key aspects of the crew's activities for many years before he became the crew boss in 1989. When Infelise said that Gervais had to pay street tax to his crew, Spilotro, the boss of another crew, conceded. When Infelise demanded that Miller join his crew, Miller complied and gave up half of his independent bookmaking profits to the crew. When Pielet wanted to switch to Carlisi's crew, he was only permitted to do so after Infelise gave his permission. Contrary to Infelise's denials, the evidence clearly demonstrates that Infelise provided leadership to the Ferriola Street Crew prior to Ferriola's death and, as he concedes,[35] he ran the crew after Ferriola's death in 1989. Therefore, this court agrees with the probation officer and the government that Infelise should receive a 4 point enhancement pursuant Section 3B1.1. Infelise's objection to this assessment is overruled.

Infelise also objects to the assessment of 2 points pursuant to Section 3C1.1 for obstruction of justice.[36] Infelise argues that he did not pay "hush money" to grand jury witnesses to keep them from testifying about the crew's activities. While Infelise concedes that certain persons were jailed for refusing to testify despite having been given immunity, he argues that there is no evidence showing that Infelise told them not to testify or that they would be paid if they did not testify. Infelise characterizes the payments made to persons in jail or their families as "friends . . . helping friends who were incarcerated because they decided to be loyal to their friends."[37]

This court is not persuaded by Infelise's altruistic explanation of the payments because the evidence presented at trial adequately demonstrates that incarcerated persons were paid to protect the crew during the course of the grand jury investigation.[38] For example, in a recorded conversation between Infelise and Nicholas on September 2, 1986, the night before Nicholas was to report to jail for civil contempt, Infelise told Nicholas: "Well I'll tell you what I want, want to know. Ah, I want to leave something there every month, but I want to know who to give it to." After Nicholas told Infelise to leave the money with "Phil," Nicholas told Infelise: "You know I love you and . . . you don't have to worry about nothing." Infelise replied: "And ah, I ain't worried about that . . ." Government Exhibit 243 at 1–2.

Such evidence adequately demonstrates by a preponderance of the evidence that the money paid to individuals, such as Nicholas, incarcerated for civil contempt was indeed hush money as the government suggests.[39]

---

35. *See* Infelise's Objections to the Presentence Investigation at 2–3.

36. Section 3C1.1 provides:

 If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

37. Infelise's Objections to the Presentence Investigation at 3.

38. As explained in footnote 20, Nicholas, Caulderullo, and Petronella each received $1,000 per month, Covone received between $1,500 and $2,000 per month, and Cesario received $500 per month while incarcerated for civil contempt after refusing to testify before the grand jury. Nicholas also received a $75,000 cash payment representing his share of the gambling profits earned by the crew during his imprisonment.

39. Infelise suggests that the evidence would reflect that Covone sat in custody because he was afraid of Jahoda and not because he was paid to do so by Infelise. However, Infelise fails to

Infelise argues that this evidence does not prove that Nicholas would have testified but for the money Infelise gave him. But, such evidence need not prove beyond a reasonable doubt that the money Infelise gave Nicholas was hush money. For sentencing purposes, the evidence must make it more probable than not that the money Infelise gave Nicholas was hush money. *See Masters*, 978 F.2d 281; *Duarte*, 950 F.2d 1255. Given Infelise's leadership role, Nicholas' involvement with the crew, and the fact that Nicholas was given immunity to testify against the crew, this court is persuaded that Infelise's promise to give Nicholas money and Nicholas' statement that Infelise had "nothing to worry about" makes it more likely than not that Infelise gave Nicholas money because he refused to testify against the crew.

■ Infelise also argues that the enhancement assigned to him for obstruction of justice is inappropriate because the evidence of bribery and corruption of officials was on a local, rather than a federal, level. Although local gambling offenses were included in the RICO charge against him, Infelise contends that his actions with respect to state and local officials do not demonstrate an obstruction of this particular investigation as required under Section 3C1.1. This court is not persuaded by Infelise's attempt to distinguish local crimes from federal obstructions. Infelise was well aware of the federal investigation of his illegal enterprise which encompassed state and federal crimes of extortion, loansharking, bookmaking, and murder. Given that the local crimes were identified as part of the RICO charge, Infelise's distinc-

tion fails to demonstrate that an enhancement is not appropriate based on Section 3C1.1.

■ Finally, Infelise objects to the obstruction enhancement because he claims that he did not conceive of the lie that undercover agent Larry Kaiser was to give when Kaiser's telephone number was recovered from DiDomenico during a search. Infelise claims that he was concerned that the government would try to create an interstate gambling offense because he and DeLaurentis had a relationship with Kaiser. Infelise contends that he was not trying to obstruct justice; he just did not want to be framed for an offense he did not commit.

However, this court ruled in its August 27, 1992 opinion regarding defendants' motion for a new trial that the Lake Geneva loan/bribe involving Kaiser was committed in furtherance of the conspiracy charged in the indictment in this case. Therefore, contrary to his contention that he was merely trying to avoid being framed for an offense he did not commit, Infelise's direction to have Kaiser lie to federal agents if questioned about his relationship with crew members demonstrates an attempt to obstruct the investigation of this case. *See* Government Exhibits 441–442. Since Infelise did not know that Kaiser was an undercover agent, Infelise thought he was helping a potential witness formulate a false explanation regarding his association with crew members. Such actions clearly warrant the obstruction of justice enhancement assigned to Infelise.[40]

present any evidence to support this contention. And, the fact that Covone may have been intimidated by Jahoda has no bearing on this court's determination that other individuals who refused to testify against the crew before the grand jury were paid hush money by Infelise.

**40.** The government contends that there are two other factors which support the assignment of two points pursuant to Section 3C1.1 to Infelise. This court agrees with the government that Infelise's attempts to conceal evidence, most notably a master parlay card which corresponded with a card recovered from Marino's home, from federal agents searching his home provides additional grounds for assessing an enhancement for obstruction of justice.

This court does not agree with the government that Smith was murdered in an effort to obstruct the government's investigation of the crew. The only evidence supporting the government's claim is Infelise's statement to Jahoda, after Smith's body was found, that Smith was a "snitch." No evidence has been presented that Infelise knew that Smith was a government informant before Smith's death or that Smith was killed because he was a government informant. Rather, as previously explained, the evidence suggests that Smith was murdered because he publicly refused to pay street tax to the crew. Therefore, this court finds that Smith's murder does not provide an additional basis for the assessment of a two point enhancement pursuant to Section 3C1.1.

## C. *Objections Only Applicable to Bellavia*

■ The probation officer assigned Bellavia a 3 point enhancement pursuant to Section 3B1.1 because Bellavia acted as a supervisor or manager of the Ferriola Street Crew. Bellavia claims that, contrary to his probation officer's finding, he was only a minor participant in the gambling enterprise, he did not supervise Freddie Braun, and only profited from the gambling operation on one occasion. While he concedes that he obtained cellular telephones for the gambling operation and collected money from Roy Salerno for the crew, Bellavia contends that such evidence does not support a finding that he was a crew supervisor.

Contrary to Bellavia's denials, this court finds that the evidence clearly demonstrates that Bellavia was a crew supervisor. Indeed, Bellavia admitted to becoming one of Infelise's top supervisors in a recorded conversation with Jahoda on October 30, 1989. The following discussion took place:

> Jahoda: Because I know when I compliment you and Louis on the promotions, as well as Solly ...
>
> Bellavia: Yeah.
>
> Jahoda: ... I think it's terrific.
>
> Bellavia: Thanks. But if you even need me for anything, I'm sure he [Infelise] told you. You can tell me anything, and I'll make sure, and I see him [Infelise] at least twice a week.
>
> Jahoda: Oh, sure.
>
> Bellavia: And it gets to him.
>
> Jahoda: Well, he, he mentioned, as I say he says, Solly, and I'd a taken it straight to you.
>
> Bellavia: Not only that, but B., it's really to protect other people, too, because when you get to his spot, you become a target. There's so many fucking people on him watching him. Now here you come to meet him. Now they got you. So it's really to protect everybody.
>
> Jahoda: Mmm hmm.
>
> Bellavia: You know. Where me, if you walk in my restaurant, and I'm sitting in the back, you're talking to me, it don't mean nothing.

> Jahoda: Right.

Government Exhibit 457 at 12–13.

Also, the evidence clearly demonstrates that Bellavia served as a crew supervisor before his 1989 promotion. For example, Bellavia supervised the bookmaking activities of Freddie Braun after crew member Bucky Ortenzi died in 1986. Bellavia claims that, at best, the evidence only shows that he was Braun's partner. This court disagrees. On October 30, 1989, Bellavia had the following recorded conversation with Jahoda regarding Braun:

> Jahoda: Freddy? How's he doing?
>
> Bellavia: Great. We're at, we're almost at 200 already.
>
> \* \* \* \* \* \*
>
> Bellavia: He's great.
>
> Jahoda: He's a $200,000 a year man. Just going (inaudible).
>
> Bellavia: He's got some nice players.
>
> Jahoda: He's got some nice people with him, too.
>
> Bellavia: Yeah.
>
> Jahoda: Yeah, and he inherited a nice business.
>
> Bellavia: Oh, I inherited him [from Ortenzi, but he's a good guy.

Government Exhibit 457 at 19–20. While Bellavia claims that he and Braun were partners, his statement to Jahoda that he "inherited" Braun suggests otherwise. This conclusion is further supported by Infelise's statements to Jahoda on September 1, 1989 that "Gabeet [Bellavia] handles him. I, I never see him." Later in the conversation, the following discussion took place:

> Infelise: After I had a couple pep talks with him, he straightened his act out.
>
> Jahoda: Who was that?
>
> Infelise: Freddie Braun.
>
> Jahoda: Freddie?
>
> Infelise: At the first, you know, because he was with Bucky [Ortenzi] all the time, so I set him down, Gabeet [Bellavia] was there and I gave him the facts of life.

Government Exhibit 420 at 24–25. While Bellavia may not have supervised all aspects

of the crew's operation,[41] this evidence adequately demonstrates that Bellavia was a crew supervisor. In addition, Bellavia supervised Freddie Braun's bookmaking and served as one of Infelise's top managers after 1989. Therefore, this court overrules Bellavia's objection to the assessment of a two point enhancement pursuant to Section 3B1.1.

Having determined that Bellavia should receive an enhancement for being a supervisor or manager, this court finds Bellavia's argument that he deserves a 2–4 point reduction for being a minor participant in the gambling operation to be without merit.[42] As stated above, while Bellavia may not have supervised all aspects of the crew's operation, sufficient evidence has been presented which demonstrates that Bellavia acted as a crew manager. Given Bellavia's extensive involvement in the crew's activities, this court finds that Bellavia is not entitled to a reduction for being a minor participant pursuant to Section 3B1.2 as he suggests.

■ The government argues that Bellavia should also be assigned a two point enhancement for obstruction of justice pursuant to Section 3C1.1. The government contends that this enhancement is appropriate because Smith's murder was motivated, in part, by crew members' belief that Smith was a "snitch." However, as explained with respect to Infelise, the only evidence supporting the government's claim is Infelise's statement to Jahoda, after Smith's body was found, that Smith was a "snitch." No evidence has been presented that Bellavia or other crew members knew that Smith was a government informant before Smith's death or that Smith was killed because he was a

government informant. Rather, the evidence suggests that Smith was murdered because he publicly refused to pay street tax to the crew. Given the lack of evidence supporting the government's contention that Smith was murdered because he was an informant, like Infelise, this court will not assign Bellavia an enhancement pursuant to Section 3C1.1 on this basis.

■ This court finds, however, that a two point enhancement is warranted pursuant to Section 3C1.1 because Bellavia obtained cellular telephones under a fake business name to protect the crew's gambling operation from detection by law enforcement.[43] Not only did Bellavia obtain telephones and service connections, but he also referred the telephone salesman to Zitello and Jahoda who also purchased cellular telephones for the crew under fictitious names. Using cellular telephones made it more difficult for federal investigators to pursue the crew's gambling operation. Bellavia's use of false identification to obtain the telephones also hindered the government's investigation. Such efforts to obstruct the government's investigation of the Ferriola Street Crew's activities clearly warrant a 2 point enhancement for obstruction of justice.[44]

■ The government also argues that Infelise and Bellavia should receive two point enhancements pursuant to Section 3A1.3. Section 3A1.3 provides:

> If a victim was physically restrained in the course of the offense, increase by 2 levels.[45]

The government contends that since Smith was restrained during the course of his tor-

---

41. For example, Bellavia was only a 25% agent of the crew's black jack operation.

42. Section 3B1.2 provides:
 Based on the defendant's role in the offense, decrease the offense level as follows:
 (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
 (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
 In cases falling between (a) and (b), decrease by 3 levels.

43. In his objections to the PSI, Bellavia admits that he obtained cellular telephones for the crew.

*See* Bellavia's Objections to Presentence Investigation Report and Guideline Calculations at 6.

44. This determination comports with this court's finding that DiDomenico should receive a two point enhancement pursuant to Section 3C1.1, in part, because he obtained cellular telephones under a false name for the crew. *See United States v. DiDomenico*, 90 CR 87–8, 1992 WL 390990 (N.D.Ill. Dec. 11, 1992).

45. Section 1B1.1(i) defines "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up."

ture/murder, this enhancement is appropriate. However, the government has not provided and this court is unaware of any evidence which sufficiently demonstrates that Smith was restrained. While Jahoda testified that he left Smith at his house with Infelise, Bellavia, and Marino, and he saw Smith slumped on the kitchen floor, Jahoda did not see nor testify about what happened to Smith after Jahoda left the house. And, while the medical examiner who examined Smith's body noted various abrasions on Smith's hands, he did not identify how those abrasions occurred in his report nor suggest that Smith was restrained. Since the government has not adequately supported its contention that Smith was restrained, this court will not assign Infelise and Bellavia two point enhancements pursuant to Section 3A1.3.

### D. *Conclusions Regarding Infelise's and Bellavia's Objections*

In sum, under former Section 2A2.1, Infelise's total adjusted offense level for Racketeering Act 17(a) is 39. This figure represents a base level of 20 and the addition of 2 points for more than minimal planning, 4 points for use of a dangerous weapon, 5 points for grave bodily injury to the victim, 2 points for the pecuniary motive for the conspiracy, 4 points for his leadership position, and 2 points for obstruction of justice. Under former Section 2A2.1, Bellavia's total adjusted offense level for Racketeering Act 17(a) is 38. This figure represents a base level of 20 and the addition of 2 points for more than minimal planning, 4 points for use of a dangerous weapon, 5 points for grave bodily injury to the victim, 2 points for the pecuniary motive for the conspiracy, 3 points for his supervisory or managerial position, and 2 points for obstruction of justice.

### E. *The Government's Motion for Upward Departure for Conspiracy to Murder Hal Smith*

■ Relying on *Masters,* the government claims that additional upward departures should be added to Infelise's and Bellavia's scores to bring their total adjusted offense levels up to 43. While former Section 2A2.1 provides enhancements for use of a weapon and bodily injury, it does not provide for the actual death of the victim of the conspiracy. In order to adequately account for Smith's death, the government contends that an upward departure must be added to defendants' scores pursuant to Section 5K2.1.

Section 5K2.0 provides:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the courts. Nonetheless, this subpart seeks to aid the court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines.... the court may depart from the guidelines, even though the reason for departure is taken into consideration in the guidelines ... if the court determines that, in light of unusual circumstances, the guideline level attached for that factor is inadequate.

One circumstance which the Commission envisioned might warrant an upward departure is established in Section 5K2.1. This section provides that if death resulted, the sentencing court may increase the sentence above the authorized guideline range. The provision also explains:

Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerous-

ness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury. For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

U.S.S.G. § 5K2.1.

As the government notes, in *Masters*, the Seventh Circuit specifically approved the use of an upward departure to account for the death of a conspiracy victim even where the defendant was not found guilty of murdering the victim. Given this binding precedent, this court finds that such an upward departure is appropriate in this instance. Like Judge Zagel in *Masters*, this court has determined that sufficient evidence has been presented to prove by a preponderance of the evidence that Hal Smith died as a result of the conspiracy to murder him and that Infelise and Bellavia should be held accountable for Smith's death. Former Section 2A2.1 and its related enhancements clearly do not adequately account for this finding.

■ Having determined that an upward departure pursuant to Section 5K2.1 is appropriate, the remaining question is how high a departure is warranted. This court finds that a departure up to level 43 is appropriate because the evidence presented sufficiently demonstrates that Smith's murder was premeditated and that more than minimal planning was required. Smith refused to pay street tax to the crew during 1983–1984 and had a loud argument about it with DeLau-

rentis in late February or early March 1984. According to Jahoda's trial testimony, it was after this meeting, in the spring of 1984, that Infelise, Bellavia, and Marino began stalking Smith. They had Jahoda set up meetings with Smith so that they could observe him. Then, on February 7, 1985, Jahoda brought Smith to his house pursuant to Infelise's February 5, 1985 order. As ordered by Infelise, Jahoda and Smith drove Smith's car to Jahoda's house, Jahoda sent Smith into the house through the kitchen, and Jahoda never entered the house.

This testimony amply indicates that crew members carefully planned Smith's murder before he was brought to Jahoda's house on February 7, 1985. Infelise, Bellavia, and Marino spent several months stalking Smith before they set up the murder plan with Jahoda at a February 5, 1985 meeting. Given defendants' premeditation and detailed planning, this court finds that it is appropriate to upwardly depart to a level comparable to the offense level for first degree murder which is 43. Therefore, Infelise and Bellavia should be assigned upward departures pursuant to Section 5K2.1 so that their total adjusted offense levels are 43.[46]

■ Infelise argues that an upward departure for Smith's murder is inappropriate because one cannot seek consecutive sentences for conspiracy to commit murder and for the murder itself. According to Infelise, Application Note 4 to Section 3D1.2(a) specifically provides that when one count charges conspiracy and the other charges a substantive offense which was the sole object of this conspiracy, the counts must be grouped together.

Contrary to Infelise's contention, the upward departure being assigned is not an

---

46. The government also argues that their motion for an upward departure is supported by Section 5K2.8. This section provides:

> If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

U.S.S.G. § 5K2.8. While a departure beyond that which has already been assigned is not pos-

sible, this court notes that this section further supports the government's request for upward departure. The medical examiner testified at trial that Smith had at least 45 non-fatal wounds and injuries in the face, neck, and head areas. These wounds included contusions, bruises, stab wounds, and lacerations, and Smith's neck was slit. This testimony supports the government's assertion that Smith was tortured and such brutal and cruel conduct suggests an additional basis for the upward departures assigned to Infelise and Bellavia.

attempt to sentence the defendants for murder and for conspiracy to murder. The upward departure being assigned to defendants is only intended to reflect the seriousness of defendants' offense. The Seventh Circuit has specifically recognized that consideration of all aspects of a defendant's conduct, including crimes which were proven by a preponderance of the evidence, is appropriate at sentencing.

In *Masters,* defendant argued that he should not be held accountable for his wife's death because, despite having been found guilty of conspiracy to murder her, he was not found guilty · of murdering her. In response to this argument, the Seventh Circuit stated:

> Our dispute concerns the selection of a sentence for the crime of conspiracy. A sentence at the top of the statutory range does not punish Masters for a crime he didn't commit; it uses all available information about his character and dangerousness in choosing the sentence for the crime of which he stands convicted. Judges have been considering defendants' activities and character since long before there were guidelines, with consistent approval from the highest court. (Citations omitted). This is one reason why we have held that judges may take other crimes into account when selecting a sentence under the guidelines, even if the defendant has been charged with and acquitted of those crimes. (Citations omitted). An acquittal means that the charge was not proven beyond a reasonable doubt; it does not mean that the defendant didn't do it. (Citations omitted).

*Masters,* 978 F.2d at 285–86. The assessment of an upward departure to the statutory maximum in this case for Hal Smith's death is identical to the upward departure to the statutory maximum in *Masters.* The government has proven by a preponderance of the evidence that Infelise and Bellavia are responsible for Hal Smith's death. This is all that is required for sentencing purposes. Since former Section 2A2.1 does not adequately reflect the death of the conspiracy victim, it is not unreasonable to upwardly depart 5–6 levels to account for this extenuating circumstance.

Infelise argues that an offense level of 43 is inappropriate because, even if an upward departure is factored in, Infelise's offense level cannot exceed the offense level for career offenders pursuant to Section 4B1.1. Since he does not qualify as a career offender under Section 4B1.1, Infelise argues that his offense level should not be increased higher than the increase available for career offenders. However, as the government properly suggests, the guidelines do not indicate that a career offender cannot be assessed an upward departure. And, even assuming that Infelise qualified as a career offender, the upward departure assigned to him pursuant to Section 5K2.1 would not have been factored into his career offender calculation. Therefore, Smith's death would still be an 'aggravating circumstance not adequately accounted for by the guidelines and would provide an appropriate basis for an upward departure. Therefore, Infelise's objection to the upward departure is overruled and this court concludes that under Judge Zagel's first calculation method relying on former Section 2A2.1, Infelise's and Bellavia's total adjusted offense levels are 43.

Although the government has not argued that Judge Zagel's second calculation method should be applied, under the Seventh Circuit's ruling in *Masters,* this court finds that this method provides further support for this court's determination that Infelise's and Bellavia's total adjusted offense levels should be 43. Under this method, rather than turning to the guideline for conspiracy to commit murder, this court turns to Section 2A1.1, the guideline for first degree murder, which requires an offense level of 43. As thoroughly discussed above, sufficient evidence has been presented to prove by a preponderance of the evidence that Infelise and Bellavia must be held accountable for Hal Smith's death. Sufficient evidence has also been presented to demonstrate by a preponderance of the evidence that Hal Smith's murder was premeditated and involved significantly more than minimal planning. These determinations underscore the appropriateness of relying on the guideline for first degree murder

to calculate Infelise's and Bellavia's offense levels.

Finally, Judge Zagel's third calculation method also supports this court's determination that Infelise's and Bellavia's offense levels should be 43. Under this method, this court turns to the current version of the guidelines for conspiracy to commit murder. Section 2A1.5 provides that if a defendant is found guilty of conspiracy to commit murder and the victim dies as a result of that conspiracy, the court must sentence that defendant in accordance with Section 2A1.1 (First Degree Murder). The offense level for Section 2A1.1 is 43. Since Infelise and Bellavia have been found guilty of conspiracy to commit murder and there is sufficient evidence to prove by a preponderance of the evidence that Hal Smith died as a result of that conspiracy, the appropriate offense level to assign defendants under Section 2A1.5 is 43.

Infelise argues that reliance on Section 2A1.5 violates his rights under the ex post. facto clause of the Constitution. Smith was murdered in 1985 and the indictment in this case was returned in February 1990, but the addition of Section 2A1.5 to the guidelines did not take effect until November 1990. Infelise argues that defendants should not suffer such a substantial increase in punishment based upon a subsequent amendment to the guidelines.

While the appellate court did not directly rule on this issue, the Seventh Circuit upheld the propriety of relying on Section 2A1.5 in a case, like this one, where the conspiracy took place before the amendment to the guidelines, but the sentencing took place after the amendment. *Masters,* 978 F.2d at 284. In *Masters,* the Seventh Circuit recognized that Congress requires courts to apply the guidelines "that are in effect on the date the defendant is sentenced." *Id.* (citing 18 U.S.C. § 3553(a)(4)). The Seventh Circuit also cited *United States v. Bader,* 956 F.2d 708 (7th Cir.1992), a case which was critical of applying ex post facto analysis to the

guidelines. Moreover, the Seventh Circuit determined that ex post facto issues really were not at issue because Judge Zagel had determined that Amendment 311 clarified, rather than changed, the law.[47] The Seventh Circuit's response bolsters this court's determination that Section 2A1.5 supports the assignment of offense levels of 43 to Infelise and Bellavia.

In sum, this court has determined that it is bound by the Seventh Circuit's determination in *Masters* in establishing Infelise's and Bellavia's offense level for Racketeering Act 17(a). Applying the three calculation methods recognized in *Masters,* Infelise and Bellavia must be assigned offense levels of 43 because the evidence demonstrates by a preponderance of the evidence that Infelise and Bellavia should be held accountable for Hal Smith's death. However, since none of the counts for which Infelise and Bellavia were convicted bear a maximum penalty of life imprisonment, this court finds that the best way to effectuate the sentence described above is to impose consecutive sentences on all counts. This determination comports with Section 5G1.2(d), which provides:

> If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects sentences on all counts shall run concurrently, to the extent otherwise required by law.

This calculation method has also been approved by this Seventh Circuit. *See Masters,* 978 F.2d at 1369.

### F. *Other Upward Departure Issues and Enhancements*

The government argues that Infelise and Bellavia should also receive upward departures for participation in organized crime.[48] Section 5K2.0 establishes that an

---

47. Amendment 311, effective November 1, 1990, moved conspiracy to commit murder from Section 2A1.1 to a new Section 2A1.5. *Masters,* 978 F.2d at 284.

48. While a departure above level 43 is not possible under the guidelines, this court will still evaluate the government's request so as to have a complete record of all potentially appealable issues with respect to defendants' sentences.

upward departure is only permissible if the sentencing court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." U.S.S.G. § 5K2.0. The government argues that participation in organized crime is not adequately accounted for under the RICO sentencing guidelines. Therefore, the government contends that given Infelise's and Bellavia's extensive involvement in organized crime, such an upward departure is warranted in this case.

Defendants counter that an upward departure is not warranted in this case because the RICO guidelines adequately account for one's participation in organized crime. As Infelise explains: "Clearly, there is no question that RICO was enacted for the purpose of fighting organized crime. While it is true that one does not have to be a member of organized crime to be prosecuted for RICO, the main thrust of the Guidelines was to punish those who act as an enterprise in an organized way in committing crimes. It is therefore very clear that the organized criminal element of an enterprise is already included in the racketeering guideline base level of 19." [49]

As the government suggests, RICO is intended to be a broad statute which can be applied to legitimate and illegitimate enterprises. *See United States v. Turkette*, 452 U.S. 576, 580–81, 101 S.Ct. 2524, 2527–28, 69 L.Ed.2d 246 (1981); *United States v. Lee Stoller Enterprises*, 652 F.2d 1313, 1316–18 (7th Cir.1981); *United States v. Aleman*, 609 F.2d 298, 302–03 (7th Cir.1979). However, contrary to the government's contention, the

fact that RICO can be applied to both legitimate and illegitimate enterprises does not necessarily mean that RICO does not adequately account for a defendant's participation in organized crime. Indeed, when applied to illegitimate enterprises, this is exactly what RICO is intended to do. *See Aleman*, 609 F.2d at 303. The fact that RICO is part of the Organized Crime Control Act, whose stated purpose is to eradicate organized crime, lends strong support to this determination. *See* The Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 923 (1970) (Statement of Purpose and Intent).[50]

The government notes that this court has found and the Seventh Circuit has approved the assessment of an upward departure for use of a defendant's organized crime connections to further his criminal activities. *See United States v. Schweihs*, 733 F.Supp. 1174 (N.D.Ill.1990), *aff'd in part and rev'd in part*, 971 F.2d 1302 (7th Cir.1992). However, this court's determination in *Schweihs* that such an upward departure was appropriate does not necessarily mean that such a determination is appropriate in this instance. Unlike Infelise and Bellavia, the *Schweihs* defendant was not convicted of a RICO violation. Rather, he was convicted of conspiracy to commit extortion, attempted extortion, and solicitation to commit a crime of violence. It was the fact that these offenses did not account for one's involvement with organized crime, like a RICO violation, that persuaded this court to assess an upward departure in that case. *See Schweihs*, 733 F.Supp. at 1179. Here, RICO adequately accounts for defendants' membership in organized crime. Therefore, the government's motion for an

---

**49.** Infelise's Objections to the Presentence Investigation at 10.

**50.** The government also argues that the computation method for Section 2E1.1 demonstrates that a defendant's membership in organized crime is not accounted for under RICO. Section 2E1.1 requires that the base offense level for a RICO violation be the greater between 19 and the offense level applicable to the underlying racketeering activity. The computation of the offense levels for each underlying activity is made by assessing each offense and its adjustments as if each underlying activity was a separate offense. *See* Section 2E1.1, Application Note 1.

According to the government, the total offense level for a RICO violation is established by reference to the underlying racketeering acts committed by a defendant, without even considering the defendant's membership in organized crime. However, as this court has noted, RICO was established, in significant part, to assist in the eradication of organized crime. This court is not persuaded that the method for calculating RICO offense levels overcomes this fact and warrants assessing defendants an upward departure for their participation in organized crime.

upward departure for participation in organized crime is not warranted.[51]

 Defendants also raise several objections regarding computations for other offenses of which they have been found guilty.[52] Infelise argues that he should not receive a 4 level enhancement to his offense level for Racketeering Acts 6, 10(a), and 11(a), the extortions of Kenton Pielet, George Miller, and Patrick Gervais, for having a leadership role because defendant did not hold a leadership position when these extortions occurred. However, this court has already determined that Infelise held a leadership position in the Ferriola Street Crew throughout the approximately 11 year period covered by the indictment in this case even though he did not become the crew's boss until 1989. Pielet's testimony supports this determination. Pielet testified that it was Infelise who told him that he would be held accountable for Holler's debt and that he would have to pay street tax to the crew from then on. Pielet further testified that shortly thereafter, when he wanted to switch to Sam Carlisi's crew, he had to obtain permission and resolve Holler's debt. Gervais also testified that after Infelise became involved, Gervais' crew boss, Victor Spilotro, told him that he would have to start paying street tax to the Ferriola Street Crew.

 Infelise also argues that he should not receive an enhancement for obstruction of justice with respect to Racketeering Acts 6, 10(a), and 11(a) because Nicholas, Otto, and Kaiser could only have testified regarding gambling which occurred after these extortions and could not have implicated Infelise in them. The jury found Infelise guilty of Pielet's, Miller's, and Gervais's extortions and sufficient evidence has been presented which demonstrates that Infelise was involved in the noted extortions. Therefore, whether Nicholas, Otto, or Kaiser could implicate Infelise in these offenses, Infelise was involved and can be held accountable for them.

The fact that Nicholas, Otto, and Kaiser might only testify regarding activity which occurred after Pielet's, Miller's, Gervais' extortions has no bearing on this court's determination that Infelise should receive an enhancement for obstruction of justice. Section 3C1.1 provides that an enhancement is warranted if the defendant obstructed or impeded the administration of justice during the investigation, prosecution, or sentencing of the instant offense. This court has already determined that Infelise obstructed the investigation of the RICO conspiracy alleged in Count 1 of the indictment, of which Racketeering Acts 6, 10(a), and 11(a) are a part, by paying off grand jury witnesses and encouraging Kaiser to lie about his relationship with crew members if questioned by federal agents. Therefore, Infelise's objections to the enhancements assigned to Racketeering Act 6, 10(a), and 11(a) are overruled.

51. With respect to Infelise, the government further argues that if this court does not accept in whole or in part the government's guideline calculations and/or recommended departure for Smith's murder, an upward departure would be warranted pursuant to Section 3D1.4 (Determining the Combined Offense Level). The background notes to Section 3D1.4, in pertinent part provide:

> In unusual circumstances the approach adopted in this section could produce adjustments for the additional counts that are inadequate or excessive. If there are several groups and the most serious offense is considerably more serious than all of the others, there will be no increase in the offense level resulting from the additional counts.... Situations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines....

As the government suggests, since Infelise's offense level for Racketeering Act 17(a) is substantially higher than these other offenses, significant and extensive criminal activity is unaccounted for under Section 3D1.4. Even if Infelise's offense level for Racketeering Act 17(a) were only 34, this offense level overshadows the offense levels for at least 7 extortions, 7 bribery schemes, wagering offenses, and the income and wagering tax offenses. Therefore, had this court not assessed Infelise the government's requested upward departure for Hal Smith's murder, Section 3D1.4 would provide an additional basis for an upward departure.

52. While defendants' remaining objections have no bearing on their sentences because these offenses are overshadowed by defendants' offense levels for Racketeering Act 17(a), for the purposes of a complete record, this court will review defendants' and the government's remaining objections to the PSI.

■ Infelise next argues that he should not be assessed an enhancement pursuant to Section 3B1.1(a) with respect to Racketeering Act 26 which charged Infelise with conspiring to bribe Wisconsin public officials. Infelise argues that he could not have played a leadership role because this was DeLaurentis' private transaction and not one of the crew's transactions. However, this court ruled in its August 27, 1992 opinion regarding defendants' motion for a new trial that the Lake Geneva loan/bribe involving undercover agent Kaiser was committed in furtherance of the conspiracy charged in the instant indictment. Therefore, the 4 point enhancement assigned for Infelise's leadership role is appropriate with respect to Racketeering Act 26.

Infelise also claims that he should not receive an enhancement for obstruction of justice with respect to Racketeering Act 26. Infelise contends that there was never any attempt to have Kaiser lie about the investigation of the Lake Geneva matter. Infelise states: "There may have been an obstruction of or protection from the local law enforcement for local crimes which much later the government chose to include in a RICO conspiracy, but there was no obstruction of the instant case."[53] Not only has this court determined that the Lake Geneva transaction was committed in furtherance of the instant offense, but this court has determined that Infelise's role in having Kaiser lie to federal agents if questioned warrants the application of Section 3C1.1. Helping a potential witness formulate a false explanation regarding his association with crew members demonstrates an attempt to obstruct the investigation of the RICO conspiracy charged in Count 1. Therefore, Infelise's objection to the assessment of an obstruction enhancement to Racketeering Act 26 is overruled.[54]

■ With respect to Counts 16–17, the probation officer applied Section 2T1.3(a)(2) which establishes a base offense level of 6 for these offenses. The government argues that

Section 2T1.3(a)(1) is also applicable because the offenses were committed to facilitate the evasion of a tax. The government contends that the higher offense level between Section 2T1.3(a)(1) and (2) should be applied in this instance. Under the tax table at Section 2T4.1(I), the base offense level for these counts would be 15. The probation officer did not apply Section 2T1.3(a)(2) because she believed Infelise committed the offenses charged in Counts 16–17 to avoid detection of his criminal enterprise by law enforcement authorities and not to facilitate the evasion of a tax.[55] However, this court agrees with the government that these two reasons for Infelise's actions are not mutually exclusive. The evidence presented suggests that Infelise took steps to hide income from his illegal activity and to avoid paying taxes on the money he earned. Therefore, this court finds that Section 2T1.3(a)(2) is applicable to Counts 16–17 as the government suggests.

■ The government also contends that enhancements pursuant to Sections 2T1.2(b)(2) and 2T1.3(b)(2) should be applied to Counts 16–17 and 39–42. These provisions provide for two point enhancements where sophisticated means were used to impede discovery of the nature and extent of the offense. See Sections 2T1.2(b)(2) and 2T1.3(b)(2). This court is persuaded that sophisticated means were used to impede the discovery of Infelise's offenses. For years, Infelise received W–2 forms and a legitimate source of income from Flash Trucking although Infelise spent the majority of his time working on crew activities. Flash Trucking was primarily used as a base of operations and message center for the crew's gambling operation. Infelise also used fictitious entities to obtain mobile telephones. By using mobile telephones, Infelise and the crew impeded the discovery of their wagering business and the income derived from it. Infelise also attempted to conceal his enterprise profits by investing $700,000 in a Florida property in his mother-in-law's name and

---

**53.** Infelise's Objections to the Presentence Investigation at 5.

**54.** Infelise argues that he also should not receive obstruction enhancements to Racketeering Acts 5(a), 5(b), 5(c), and 7; Unlawful Debts 4 and 21–

23; and Counts 2, 6, and 7. For the reasons stated above, Infelise's objection is overruled.

**55.** See PSI at 20, lines 895–901.

$200,000 in a real estate deal with Bellavia which had a business front and nominees for the investment. Such evidence adequately demonstrates that "sophisticated means" enhancements are warranted with respect to Counts 16–17 and 39–42. The addition of these enhancements brings Infelise's offense levels to 17 for Counts 16–17 and to 14 for Counts 39–42.[56]

■ The government also argues that while he was not convicted of these offenses, Infelise's involvement in the extortions of Ken Eto and Gerald Kurth should be considered at sentencing. As explained in footnote 26, relevant conduct can be considered for sentencing purposes. The Seventh Circuit has established that a court must increase a defendant's base offense level to account for "relevant conduct" which was part of the same course of conduct or common scheme as the convicted offense, regardless of whether the defendant was charged with or convicted of carrying out those acts. *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir.1991); *United States v. Franklin*, 902 F.2d 501, 504 (7th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990). To increase a defendant's base offense level for uncharged or unconvicted activities, the court must find by a preponderance of the evidence that those activities were "part of the same course of conduct or common scheme or plan" as the convicted offense. *Duarte*, 950 F.2d at 1263. A court making this determination "should explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activities bore the necessary relation to the convicted offense." *Id.; see also United States v. Jewel*, 947 F.2d 224 (7th Cir.1991); *United States v. Edwards*, 945 F.2d 1387 (7th Cir.1991); *United States v. Morrison*, 946 F.2d 484 (7th Cir.1991).

■ Upon review of Eto's trial testimony, this court is persuaded that the government has proven by a preponderance of the evidence that Infelise participated in Eto's extortion. At trial, Eto testified that he was introduced to Infelise by Turk Turello in the late 1950's or early 1960's. In 1980, Eto sought the Ferriola Street Crew's permission to open a Bolita game. It was agreed that Eto would pay the crew $5,000 per month starting in May 1980 to operate the game. According to Eto, Vince Solano, Eto's crew boss with the Rush Street Crew, told him to pay the money to Infelise. Eto testified that he met Infelise and Marino on a monthly basis until February 1982 to pay his street tax.

Eto also testified that he paid Infelise and Marino protection money, which was to be passed on to John Monteleone, to run a Monte game. In the fall of 1981, when Eto decided to move the Monte game because of all the heat it was getting, Infelise gave him permission to move the game to Lake County, but Eto declined. In early 1982, Infelise and Marino took over Joe Borsellino's bookmaking operation, but permitted Eto to maintain his interest in the business. According to Eto, Infelise also provided him with a sports betting line. In late 1982, Eto made arrangements for two independent bookmakers to also receive a betting line and number from Infelise and Marino. Such evidence clearly makes it more likely than not that Infelise participated in Eto's extortion. Moreover, Eto's extortion was part of the activities of the RICO conspiracy of which Infelise was convicted. Therefore, Eto's extortion is clearly related to the same course of conduct charged in Count 1. This is all that is required to consider Eto's extortion at sentencing. *See Duarte*, 950 F.2d at 1263. Therefore, the government's request that Eto's extortion be included in Infelise's guideline calculations is granted.

■ However, this court finds that Kurth's extortion should not be included in Infelise's guideline calculations. The only evidence the government has presented to

---

**56.** Infelise also argues that he should not receive leadership role and obstruction enhancements with respect to Counts 16–17 and 39–42. Infelise argues that "there is neither leadership nor obstruction with respect to filing his own personal tax returns" and filing tax information. Infelise's Objections to Presentence Investigation at 7–8. Since this court and the government also agree that these enhancements are not warranted, no obstruction or leadership role enhancements should be assessed with respect to these counts.

support its contention that Infelise was involved in Kurth's extortion is a May 31, 1989 taped conversation between Jahoda, Infelise, and DeLaurentis. The following discussion took place:

Infelise: ... Well what the fuck, when's the last time we did business with the kid [Kurth]?

Jahoda: Oh, fuck, '84?

DeLaurentis: The last time I seen him is when I told him to go to Wisconsin and stay there. Remember, we were at Golden Country.

Jahoda: At Golden Country.

DeLaurentis: Golden Country.

Jahoda: You stabbed him, no, no, you gave him a blast.

Infelise: The guy from Golden Country got subpoenaed. I'm just telling you B.

Government Exhibit 403, at 11. While this discussion clearly demonstrates that Infelise knew about crew business with Kurth, this fact does not show by a preponderance of the evidence that Infelise was involved in Kurth's extortion. Absent additional evidence which more clearly demonstrates Infelise's involvement, Kurth's extortion should not be included in Infelise's guideline calculations.

 The government further argues that Bellavia's involvement in the collection of juice loan payments from "Romi's Guy," a client of bookmaker Roman Lewis should be considered at sentencing. This court agrees. Bellavia collected juice loan payments from Romi's Guy on the 15th of every month. The following telephone conversation between Infelise and Bellavia was recorded on May 12, 1986:

Infelise: And, and the other thing I wanna tell ya, I didn't know if you were gonna be gone or not. Don't forget that guy is due this week, Romi's guy.

Bellavia: Oh, alright.

Infelise: The fifteenth.

Bellavia: Very Good.

Glad you reminded me 'cause I didn't know.

Infelise: Bobby, you gotta stay on top of these things, Robert.

Bellavia: Yeah, but I didn't know the date.

Infelise: I can't do all your thinking for ya know.

See Government Exhibit 148. In June 1986, Romi's guy paid off the initial juice loan. The following conversation about this pay off took place:

Infelise: Bobby just called me again.

Marino: Who did?

Infelise: (Laughs). Gabeet.

Marino: What happened now?

Infelise: Well you know that guy with Romi?

Marino: Yeah.

Infelise: He, he's b ... he brought, he brought the stuff back.

Marino: Oh.

Infelise: ... you know, so, he wanted to tell me, he said, well, I says, call me tomorrow and I'll meet ya'.

Marino: Yeah.

Infelise: Uh ...

Marino: He brought some?

Infelise: No, he brought it all.

Marino: No!

Infelise: Yeah.

Marino: God!

Infelise: Well, that's what he says, he brought it all back. You know, I thought he was gonna' ask for three month, he hadn't even have it for two months, really.

See Government Exhibit 299. In August 1986, Romi's guy had a juice loan of $13,000 and requested an additional $10,500. See Government Exhibit 211. In subsequent conversations, Infelise again reminded Bellavia to pick up Romi's guy's payments. On August 29, 1986, the following conversation, in pertinent part, took place:

Infelise: Listen, I'll see you tomorrow. You got to pick up thirteen twenty from Romi.

Bellavia: When?

Infelise: It's gotta be in tomorrow.

Bellavia: Tomorrow?

Infelise: Yeah.

Bellavia: Alright.

Infelise: Okay?

Bellavia: Yes. I'll give him a call.

Government Exhibit 229. Such evidence proves by a preponderance of the evidence that Bellavia collected juice loan payments from Romi's guy. Therefore, it is appropriate to consider this relevant conduct at sentencing as the government suggests.

■■■ In addition, the government argues that Infelise's guideline calculation for Unlawful Debt 23 should not be the same as that for Unlawful Debts 4 and 21–22. While Unlawful Debts 4 and 21–22 arise out of the collection of wagering debts, Unlawful Debt 23 arises out of the collection on undercover agent Kaiser's juice loan. Application Note 2 to Section 2E1.1 provides that where the underlying offense violates state law, the offense level corresponding to the most analogous federal offense should be used. The government contends that Section 2E2.1, rather than 2E3.1 as applied by the probation officer, should be applied because it is the most analogous guideline to this offense.

This court agrees. Section 2E2.1 applies to the making, financing, or collecting of extortionate extensions of credit. Section 2E3.1 applies to engaging in a gambling business. As the government suggests, Section 2E2.1 is clearly more analogous to the collection of juice loan money from undercover agent Kaiser as charged in Unlawful Debt 23 than is Section 2E3.1. Therefore, this court finds that Section 2E2.1 should be applied to Unlawful Debt 23 as the government requests.[57]

■■■ Finally, the government argues that Bellavia should receive an upward departure on his criminal history score because it does not adequately reflect the seriousness of his past conduct. Bellavia has prior convictions for theft of a motor vehicle, armed robbery, and possession of counterfeit plates that were not counted because of their age. The government argues that Bellavia's criminal history score should be amended to reflect these offenses.

In *United States v. Gammon*, 961 F.2d 103 (7th Cir.1992), the Seventh Circuit recognized that convictions excluded from consideration because of age which were similar to the instant offense or that demonstrated criminal livelihood could be considered at sentencing. The court further recognized that even in those cases where these two factors are not present, consideration of prior convictions excluded by age could be appropriate where the sentencing court found that the Sentencing Commission did not sufficiently take another factor into consideration. *Id.* at 107–08. This determination comports with Section 4A1.3 which provides that if a defendant's criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the sentencing court may upwardly depart from the guidelines.

While upward departures may be available under Section 4A1.3 and the law of this jurisdiction, this court is not persuaded that such a departure is warranted in this instance. Bellavia's convictions for theft of a motor vehicle, armed robbery, and possession of counterfeit plates are not similar to his instant offenses. Moreover, the government fails to present any evidence which demonstrates that Bellavia's old convictions indicate that he is likely to commit other crimes. Nor does the evidence presented suggest that some other issue is raised by Bellavia's prior convictions that the Sentencing Commission failed to take into consideration. While this court does not wish to downplay the seriousness of Bellavia's prior convictions, this court finds that they are not so numerous, or so closely related in time or nature to warrant an upward departure. This court is confident that Bellavia's sentencing range, as established by his total adjusted offense level and his current criminal history score adequately accounts for the seriousness of Bellavia's offenses. Therefore, the government's request for an upward departure is denied.

57. The government also initially disagreed with the probation officer regarding the proper offense level for Pielet's extortion. The government argued that Infelise should receive a two point enhancement for bodily injury with respect to the extortion of Kenton Pielet because Marino slapped Pielet. This court need not address it because, upon review of Pielet's testimony, the government now withdraws this objection.

In sum, this court finds that Infelise's total adjusted offense level is 43 and his criminal history category is IV. This corresponds to a life sentence. This court also finds that Bellavia's total adjusted offense level is 43 and his criminal history category is I. The guideline sentence is life imprisonment. Since none of the counts for which Infelise and Bellavia were convicted bear a maximum penalty of life imprisonment, this court will impose consecutive sentences on all counts.

### Conclusion

For the reasons stated above, this court finds that Infelise's total adjusted offense level is 43, his criminal history category is IV, and his guideline sentence is life in prison. This court also finds that Bellavia's total adjusted offense level is 43, his criminal history category is I, and his guideline sentence is life in prison. Since none of the counts for which Infelise and Bellavia were convicted bear a maximum penalty of life imprisonment, this court will impose consecutive sentences on all counts.